[Civ. No. 14674. First Dist., Div. One. Aug. 15, 1951.]

EPHRAIM ADAMS et al., Appellants, v. CORABELLE HERMAN, as Administratrix, etc., et al., Respondents.

94

Louis J. Glicksberg and James A. Ersted for Appellants.

Joseph P. Lacey and Cyrus J. McMillan for Respondents.

PETERS, P. J.—This action was brought by Mr. and Mrs. Ephraim Adams against Mr. and Mrs. A. E. Alldis. Before trial Mr. Alldis died and his administratrix was substituted as one of the parties defendant. The complaint is in two counts. The first count charges a breach of a fiduciary relationship between A. E. Alldis and plaintiffs, in that it is averred that Alldis, a real estate broker, while acting as agent for plaintiffs in selling their property, without disclosing to plaintiffs that Mrs. Alldis was the purchaser, bought the property for $10,500, and several months later sold it to third persons for $11,500. Money damages for the alleged breach of this fiduciary relationship are requested. The second cause of action is on an open book account. At the conclusion of plaintiffs' case a motion for a nonsuit was granted as to both defendants on the ground that plaintiffs had failed to prove their case. From the judgment of nonsuit plaintiffs appeal.

A motion for a nonsuit at the close of a plaintiff's case has the legal effect of a demurrer to the evidence. Such a motion assumes that all admissible evidence in favor of plaintiff is true, and is predicated on the theory that there is no admissible evidence or reasonable inferences therefrom that would support a judgment for the plaintiff. (*Henderson* v. *Progressive etc. System*, 57 Cal.App.2d 180 [134 P.2d 807]; *Connors* v. *Southern Pac. Co.*, 91 Cal.App.2d 872

[206 P.2d 31] ; *Mastro* v. *Kennedy,* 57 Cal.App.2d 499 [134 P.2d 865].)

Tested by these standards, we think that plaintiffs established a prima facie case against both defendants, and that the nonsuit must be reversed.

The record shows the following: Mr. Adams, who is an attorney, testified that in 1944 and until 1947 he was in the Army; that in 1944 he was stationed in Oklahoma; that in that year he and his wife owned a parcel of real property in Redwood City; that it had been their former residence; that this property was vacant, and they wanted to dispose of it; that in the first part of June, 1944, he visited California and orally told several real estate firms, including A. E. Alldis, that he wanted to sell the house for $10,500 net; that he then returned to Oklahoma; that on July 16, 1944, he received a telegram from Alldis reading: "Sold house at 1010 Katherine Street Redwood City Sold Place for Cash $10,500 Wire Instructions"; that on the same day Adams telegraphed to Alldis: "Sale Ten Ten Katherine Street for Ten Thousand Five Hundred Confirmed. Forwarding Instructions Air Mail Special to California Pacific Title Redwood City"; that on the same day he sent, by letter, instructions to the title company. The letter contains this statement: "Please prepare deed to party to be designated by A. E. Alldis, Realtor and forward to me for execution."

Several days later Adams received a deed from the title company naming the California Pacific Title Company as grantee. This deed he executed and returned to the title company. That company, on instructions from A. E. Alldis, and apparently purporting to act pursuant to the instructions in Adams' letter to it, erased the name of the title company and inserted the name of Alice G. Alldis, as grantee. Subsequently, Adams received the balance of the purchase price of $10,500, less the usual deductions, including a $525 commission to Alldis.

In 1945 Adams received information that Alldis had resold the property for $11,500. He wrote to Alldis and demanded an accounting of the extra $1,000. Under date of May 18, 1945, Alldis replied, stating that he had sold the house to a party by the name of Osborne for $10,500, but two weeks later, because Mrs. Osborne became ill "I agreed to take property off his hands"; that he made certain repairs to the

premises and "about 2½ months later I resold the place." He protested that he had acted in good faith.

Adams did not return to California until August of 1947, and filed this complaint in December, 1947.

Mrs. Alldis knew very little about the transaction. She testified that her husband was a real estate broker, but that she was not, nor did she work in her husband's office. She remembered purchasing the property, but could not remember what was paid for it or to whom it was paid. She did not remember ever seeing the Adams-Alice G. Alldis deed, and had no recollection as to who received delivery of it, but thought that it must have been delivered to the office of her husband, because all business transactions were handled there. She recalled that the property was sold to the Burrs, and testified that this sale was negotiated through her husband's office. She admitted signing a deed to the Burrs, and remembered that the sale price was $11,500. The Alice G. Alldis-Burrs deed is dated September 11, 1944. She testified, in reference to the payment of the $11,500, that "It would be paid to me, of course; that is a long time ago." She could not recall whether her husband or the title company paid the money to her, or where the money was deposited. She claimed that in that period she had some personal bank accounts, but could not remember in what banks they were, and that, at the time of trial, she had no personal accounts. The money was spent, she stated, for "Expenses and sickness." Alldis died in August of 1949.

The manager of the title company testified from the records of the company. He stated that such records showed that Alldis instructed the company to prepare a deed naming the title company as grantee, and that such deed was prepared and sent to Adams; that when the duly executed deed was received back from Adams the title company was still named grantee; that two days later Alldis instructed the title company to change the grantee to Alice G. Alldis. The escrow officer who handled the transaction made the following notation, dated July 28, 1944, on the title company's work sheet: "Note—In accordance with authority from Captain Adams to Deed Property to anyone designated by Alldis (see instructions of July 16) the Deed was changed to read to Alice G. Alldis. This was done because Alldis said he promised Capt. Adams he would have the money by today and since the buyers do not know yet how they wish to take title Alice G. Alldis is to hold the same until they know. He did not

want Calif. Pac. to hold title as I told him we would charge another title fee when we deeded out.''

In the corner of the work sheet is another notation also dated July 28, 1944. It reads: ''Hold open resold to Edward K. Osborne and Dora Osborne per Mr. Alldis.'' The work sheet is signed by the escrow officer and by Alldis.

The propriety of the title company's thus erasing the name of a grantee to an executed deed and inserting the name of another grantee, and the question as to whether such act was authorized by Adams' letter of July 16, 1944, is not here involved. No question is here raised as to the validity of the deed to Alice G. Alldis. This evidence is important, however, because it demonstrates that Adams had no knowledge that Mrs. Alldis was the purchaser of the property when he executed the deed.

The records of the title company show the instructions given by Mrs. Alldis when she conveyed the property to the Burrs. The property was sold to the Burrs for $11,500. The money did not go through the title company because the instructions of Mrs. Alldis state that she already had received the amount due her. Mrs. Alldis paid the title charges. Mrs. Alldis' memory as to who prepared and who typed her instructions, whether Mr. Alldis was present when they were prepared, and whether she or Mr. Alldis delivered them to the title company was very vague. She admitted, however, that the transaction was handled through the office of her husband acting as broker.

On this evidence several questions are presented:

1. Assuming that all of the evidence was admissible against either or both respondents, does that evidence establish a prima facie case of breach of a fiduciary relationship by A. E. Alldis?

2. Assuming a prima facie case of breach of a fiduciary relationship by A. E. Alldis, would that evidence also justify a holding that Mrs. Alldis is legally responsible for such breach of duty?

3. Was Adams' testimony admissible against the estate of A. E. Alldis in view of section 1880, subdivision 3, of the Code of Civil Procedure? If not, is the admissible evidence in the case sufficient to establish a prima facie case against the estate of A. E. Alldis?

One of the important questions presented here is whether Adams, over objection, could properly testify as

to transactions had with a man now deceased, in view of the provisions of section 1880, subdivision 3, of the Code of Civil Procedure. But whatever the answer to that problem may be, it is perfectly clear that Adams' testimony was admissible against Mrs. Alldis, and no contention is made to the contrary. Moreover, even without the oral testimony of Adams, in our opinion, the remaining testimony establishes a prima facie case of a breach of a fiduciary relationship by A. E. Alldis. The telegrams between Alldis and Adams, which were admitted without objection, as well as the title company records, establish that Alldis was the agent for Adams for the sale of the property. The records of the title company show that Alldis instructed the company to prepare a deed and to send it to Adams, naming the title company as grantee. The same records show that Alldis, after the deed was executed, induced the title company to change the grantee to his wife. Mrs. Alldis, in this fashion, purchased the property for. $10,500, and Adams paid a commission to A. E. Alldis. All this was done without notifying Adams that Alldis was selling the property to his wife. Then, about two months later, Mrs. Alldis sold the property for $11,500 to the Burrs, thus realizing a quick $1,000 profit. Both sales and the details of both transactions were handled through the office of A. E. Alldis. The money was used for "sickness and expenses."

The above evidence, independent of the testimony of Adams, established a prima facie case against both defendants, and threw upon them the burden of showing that the transaction was not subject to attack.

The relationship of principal and agent is, of course, a fiduciary one. In any transaction on behalf of his principal the agent is bound to exercise utmost good faith and honesty. (*Thompson* v. *Stoakes,* 46 Cal.App.2d 285 [115 P.2d 830]; *Kinert* v. *Wright,* 81 Cal.App.2d 919 [185 P.2d 364]; *Webb* v. *Saunders,* 89 Cal.App.2d 732 [201 P.2d 816]; *Bell* v. *Scudder,* 78 Cal.App.2d 448, [177 P.2d 796].) This elementary rule is stated as follows in *Schwarting* v. *Artel,* 40 Cal.App.2d 433, 441 [105 P.2d 380] : "When the acts of an agent have been questioned by his principal and the fiduciary relationship has been established, the burden is cast upon the agent to prove that he acted with the utmost good faith toward his principal [citing cases] and that he make a full disclosure prior to the transaction of all the facts relating to the transactions under attack. [Citing cases.]"

 It is an integral part of that rule that, if the agent makes a secret profit from the agency, the principal may recover such profit. The fact that the agent may have paid a fair price for the property, or that the property could not then have been sold for a greater price, are false factors if a full disclosure, prior to sale, is not made. (See *Robertson* v. *Chapman,* 152 U.S. 673 [14 S.Ct. 741, 38 L.Ed. 592]; see, also, many cases collected and commented on in 2 Am.Jur. p. 207, § 256.)

Respondents admit that these rules apply to any secret profit made by an agent, but contend that there is no evidence here that the agent, A. E. Alldis, made any secret profit. Mrs. Aldis was, of course, not the agent of the Adamses. They urge that the sale to her, in effect, was the same as a sale to a stranger; that there is no evidence that A. E. Alldis had any interest in the property or received any of the proceeds therefrom; that there is no evidence that title was taken in Mrs. Alldis' name for any purpose of her husband; that there is no evidence that the funds used by Mrs. Alldis to purchase the property were furnished by her husband, or that he had any interest therein; and that there is no evidence that A. E. Alldis sold the property to the Burrs as his own property, or that he was not acting as the agent for his wife in that sale.

 These arguments are all predicated on the erroneous premise that an agent may sell his principal's property to his wife, without disclosing that fact to the principal, and that she may then resell at a profit, and that the principal cannot recover the profit unless he can prove that the husband retained or secured some interest in the property. That is not and should not be the law. If that were the law an agent could, with practical impunity, defraud his principal by selling his principal's property to his wife, as long as the agent is careful enough to give the appearance that he retains no interest in the property. The proper rule, supported by authorities from many states, is stated as follows in 2 American Jurisprudence page 208, section 257: "The general principle which denies the agent the right, without the knowledge and consent of the principal, to become the purchaser of property which he is employed to sell for the principal is aimed at an indirect or collusive sale or transfer, as well as a direct sale or transfer to the agent. *It precludes the agent from selling or conveying to the agent's spouse,* to a corporation in which the agent has a large concealed interest, indirectly

to himself in the name of a third person, and even to a clerk of the agent who is engaged in the affairs of the vendor relating to the sale of the land.'' (Italics added; see, generally, 80 Am.St.Rep. 555; 62 A.L.R. 63, 68.)

A case where the factual situation was quite similar to the instant one is *Tyler* v. *Sanborn*, 128 Ill. 136 [21 N.E. 193, 15 Am.St.Rep. 97, 4 L.R.A. 218]. In that case the Tylers employed Sanborn to sell some lots in Illinois. The Tylers lived out of the state. One Beard orally offered to pay $1,000 for the lots. That was a fair price. The Tylers accepted, and executed deeds to Beard, delivering them to Sanborn. Beard changed his mind and refused to go through with the sale. Sanborn mentioned this fact to his wife, who, over her husband's objections, agreed to buy the lots for $1,000. Sanborn explained this to Beard and he executed deeds to Mrs. Sanborn. Mrs. Sanborn used her own funds in making the purchase. The Tylers were not informed of the fact that Mrs. Sanborn had thus become the purchaser. When the Tylers discovered the facts they sought to set the deeds aside. It was held that, as a matter of law, the sale to Mrs. Sanborn was, in legal effect, a sale to the agent. At page 194, column 2, the court stated: ''The evidence quoted (*supra*) can leave no doubt on the mind as to the real character of the transaction. It was, in effect, a sale and conveyance to Frances C. Sanborn, by her husband, O. D. Sanborn, as the agent of the Tylers, without their knowledge. The sale to Beard was not consummated. He refused to take the property, but became an agent in fact for Frances C. Sanborn, whereby she was enabled to obtain the legal title. In equity the execution of the deed by Beard to her, and the delivery thereafter of both deeds to her, was but the execution and delivery of a deed to her by the Tylers without their knowledge. Admitting that the price paid for the property was not grossly inadequate, and that it was one with which, if it had in good faith come from Beard, the Tylers would have been satisfied, the question is still left whether the fact that the purchase was made by the wife of their agent, without their knowledge, of itself alone renders the deeds voidable at their election. The doctrine is familiar, and has been often recognized by this court, that an agent cannot, either directly or indirectly, have an interest in the sale of the property of his principal, which is within the scope of his agency, without the consent of his principal, freely given, after full knowledge of every matter known to the agent which might affect the principal,

[Citing cases.] It is of no consequence in such case that no fraud was actually intended, or that no advantage was in fact derived from the transaction by the agent. [Citing cases.] The rule is not merely remedial of wrong actually committed. It is intended to be preventive of wrong. Public policy requires, as was tersely and forcibly said by the chief justice, in *Staats* v. *Bergen,* 17 N.J. Eq. 554, that 'a trustee may not put himself in a position, in which to be honest must be a strain on him.' An agent may undoubtedly buy of his principal, or have an interest in the sale of property belonging to his principal, but in such case the burden is upon the agent to show that the principal had knowledge, not only of the fact that the agent was buying or interested, but also of every material fact known to the agent, which might affect the principal, and that, having such knowledge, he freely consented to the transaction. [Citing cases.]''

After pointing out that a sale by an agent to his wife cannot be considered as a sale to a stranger, and after pointing out that Mr. Sanborn might have a pecuniary interest in the purchased property because of his dower rights, the court stated (p. 195, col. 2): "There is, moreover, apart from this pecuniary interest, an intimacy of relation and affection between husband and wife, and of mutual influence of the one upon the other for their common welfare and happiness, that is absolutely inconsistent with the idea that the husband can occupy a disinterested position as between his wife and a stranger in a business transaction. He may, by reason of his great integrity, be just in such a transaction, but unless his marital relations be perverted he cannot feel disinterested; and it is precisely because of this feeling of interest that the law forbids that he shall act for himself in a transaction with his principal. It is believed to be within general observation and experience that he who will violate a trust for his own pecuniary profit will not hesitate to do it, under like circumstances, for the pecuniary profit of his wife.

"In our opinion the policy of the law equally prohibits the wife of the agent, as it does the agent himself, from taking title to the property which is the subject of his agency, without the knowledge and express consent of the principal."

The same rule, supported by authorities from many states, is summarized as follows in 26 American Jurisprudence page 752 at page 753, section 127: "Generally, however, where one spouse is disqualified by reason of some fiduciary relationship from securing a title, he or she cannot convey such title

to the other. It has been said that if such a rule rests only upon a supposed privity of estate between husband and wife, it might well be argued that statutes relating to married women have destroyed its foundation. The rule, however, is founded upon considerations of public policy, and conclusively imputes to the one spouse, as derived from the other, knowledge of facts, the existence of which precludes the other spouse from action. The opportunities that would be afforded for fraudulent practices would be so numerous and the difficulty of exposing them so great that courts apply the doctrine of estoppel to both, and thus close the door that offers the temptation. Thus, one spouse acting as trustee or employed as an agent to sell property cannot sell it to the other spouse, and the other spouse cannot purchase it, without the knowledge and consent of the cestui que trust, or, in the case of agency, of the principal. Where a trustee sells the trust estate to one who by previous agreement purchases for the wife of the trustee, the sale will be set aside on the application of the cestui que trust, and evidence that the sale was fair and for the best price obtainable is not admissible.''

In other words, in legal effect, a sale by an agent of his principal's property to his, the agent's wife, is the same as a sale to himself, and the same rules are applicable as if the agent sold to himself.

▮ Of course, all sales by an agent to himself of his principal's property are not prohibited. Proof of a sale to the agent by himself establishes a prima facie case against the agent. Such a sale raises a presumption that the agent obtained an unfair advantage over his principal. The burden is then on the agent to rebut the presumption, which he may do by a showing that he acted in utmost good faith and revealed all material facts to his principal. (*Helbing* v. *Helbing,* 89 Cal.App.2d 224 [200 P.2d 560].) This, however, is a matter of defense. ▮ Once the agency has been established and the fact proved that the agent, without the knowledge of the principal, sold the principal's property to himself or to his wife, the plaintiff principal has established a prima facie case sufficient to prohibit a nonsuit. These facts were proved here, and, as already pointed out, were proved independently of the oral testimony of Adams. It is clear, therefore, that it was error to have granted the nonsuit as to either defendant.

In view of the impending retrial, something must be said about the admissibility of the testimony of Adams. Section 1880 of the Code of Civil Procedure lists certain persons who

"cannot be witnesses." Subdivision 3 provides: "Parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceeding is prosecuted, against an executor or administrator upon a claim, or demand against the estate of a deceased person, as to any matter or fact occurring before the death of such deceased person."

When Adams was called as a witness, the attorney for respondents objected, citing the code section as the basis for his objection. The trial judge let Adams testify, subject to a motion to strike. Counsel for respondents cross-examined Adams. At the conclusion of appellants' case the motion to strike was granted. It is not clear from the record whether the motion to strike was granted in favor of both respondents, or was limited to the estate of Alldis. There is no doubt that Adams was perfectly competent to testify as against Mrs. Alldis. The inhibitions of section 1880(3) do not apply in her favor. (*Chapman* v. *Associated Transit Term. Corp.*, 123 Cal.App. 157 [10 P.2d 1023].)

As to the estate of Adams, appellants urge that the section does not apply because the cause of action is not to establish a claim against the estate, but to establish a trust. Actions to establish a trust do not fall within the section. (*Alvarez* v. *Ritter*, 67 Cal.App.2d 574 [155 P.2d 83]; *Humes* v. *Humes*, 56 Cal.App.2d 126 [133 P.2d 39]; *Porter* v. *Van Denburgh*, 15 Cal.2d 173 [99 P.2d 265].) The difficulty with this argument is that this is not an action to impose a trust, but an action for damages for fraud. The complaint is entitled "Complaint for Damages." The first cause of action is to recover damages for fraud, the second is on an open book account. The prayer is for money damages for fraud. The allegations necessary to establish a trust are not contained in the pleading. Thus, there is no allegation, and no proof, that the remedy at law was inadequate, nor in the pleading or proof was any attempt made to trace the trust *res*. It is quite clear that this trust argument is an afterthought intended by appellants to circumvent the section. As was said in *Holland* v. *Bank of Italy Nat. T. & S. Assn.*, 115 Cal.App. 472, 485 [1 P.2d 1031], in discussing a similar problem: "While it is settled that section 1880 of the Code of Civil Procedure has no application where a trust is sought to be established, and while equity may give relief in a proper case, the claim of a trust fund should not be allowed merely for the purpose of circumventing the provisions of

section 1880, nor unless a case is presented which clearly comes within the established rules.''

Appellants, without citation of authority, also urge that section 1880(3) has no application where the deceased is charged with fraud. They cite some out-of-state cases that do not involve statutes similar to section 1880(3). No California case is cited on the point. The section makes no such exception. The courts should not make exceptions where the Legislature has not seen fit to do so.

Appellants next argue that respondents cross-examined Adams outside the scope of direct examination, and contend that this necessarily waived the provisions of the section. Of course, cross-examination outside the scope of the direct examination, under certain circumstances, can constitute a waiver (*Deacon* v. *Bryans*, 88 Cal. App. 322 [263 P. 371]; see, also, *Lucy* v. *Lucy*, 22 Cal.App.2d 629 [71 P.2d 949]; *Davis* v. *Mitchell*, 108 Cal.App. 43 [290 P. 887]; *Stankey* v. *Palmer*, 6 Cal.App.2d 215 [44 P.2d 382]), but here the cross-examination was entirely within the scope of the direct examination. Certainly, under the circumstances here existing, mere cross-examination cannot be held to be a waiver. The respondents objected to the testimony. The trial court decided to admit it, subject to a motion to strike. Until the court ruled, the respondents were required to cross-examine. They cannot be held to have waived their objection by cross-examining while such objection was still under consideration. For these reasons, Adams was incompetent as a witness so far as the estate of A. E. Alldis is concerned.

The judgment of nonsuit is reversed.

Bray, J., and Wood (Fred B.), J., concurred.