[S. F. No. 20194. In Bank. Sept. 21, 1960.]

CHARLOTTE BROWNE REYNOLDS, Respondent, v. ROBERT PERRIN REYNOLDS et al., Defendants; STANDARD OIL COMPANY OF CALIFORNIA (a Corporation) et al., Appellants.

[S. F. No. 20195. In Bank. Sept. 21, 1960.]

CHARLOTTE BROWNE REYNOLDS et al., Respondents, v. STANDARD OIL COMPANY OF CALIFORNIA (a Corporation), Appellant.

Pillsbury, Madison & Sutro, Francis N. Marshall, G. H. Eckhardt, Jr., Robert F. Miller, James B. Atkin and Noble K. Gregory for Appellants.

John P. Austin, Marshall L. Small, Morrison, Foerster, Holloway, Shuman & Clark, O'Melveny & Myers and Paul Fussell as Amici Curiae on behalf of Appellants.

Courtney L. Moore for Respondents.

McCOMB, J.—From judgments in favor of plaintiffs in two actions seeking to compel the issuance of new stock certificates to them, after trial before the court without a jury, the corporation defendants appeal.

*Facts:* August 23, 1957, plaintiff Charlotte Reynolds brought a divorce action against her husband, Robert Reynolds, in the Superior Court in and for the City and County of San Francisco.

Mr. Reynolds had left California on or about August 14, 1957. Mrs. Reynolds obtained an order for publication of summons, which also provided that personal service of the complaint and summons might be made outside of California. Mr. Reynolds was personally served in Denver, Colorado. He did not appear in the divorce action.

On October 28, 1957, an interlocutory decree of divorce was entered in favor of Mrs. Reynolds. The trial court found that cash and specified stocks were community property of the parties and that Mrs. Reynolds was the owner of an undivided one-half interest therein, specifically that Mrs. Reynolds was the owner of, and entitled to receive, $689.03 cash, 204 shares of the common stock of California Western

States Life Insurance Company, 243 shares of the common stock of Standard Oil Company of California (hereinafter called "Standard"), and 7 shares of the common stock of Pacific Telephone & Telegraph Company, all standing in the name of Mr. Reynolds on the books of the corporations.

The court adjudged that Mrs. Reynolds was the owner of the specified number of shares of the three corporations standing in the name of Mr. Reynolds, directed the corporations to transfer the respective shares to Mrs. Reynolds, and enjoined and restrained them from transferring said shares to any other person, firm, or corporation. Mrs. Reynolds was allowed $500 per month alimony and her attorney, Courtney L. Moore, a fee of $1,250.

None of the three corporations was named as a defendant, served with process, or otherwise made a party in the divorce action.

Mr. Moore presented the interlocutory divorce decree to the transfer agents of the three corporations and demanded that the specified number of shares standing in the name of Mr. Reynolds be transferred to Mrs. Reynolds and that she be issued new certificates.

All three corporations refused to make the transfers or to issue certificates to Mrs. Reynolds, on the ground that the outstanding certificates had not been surrendered for transfer or cancellation. There is no claim that the outstanding certificates have ever been lost or destroyed.

On November 14, 1957, Mrs. Reynolds brought an action against her husband and the three corporate defendants to quiet title to her half of the stock as determined in the divorce action, to compel the issuance of new certificates to her, and to impose a lien on the remaining shares in Mr. Reynolds' name to secure the future payment of her alimony.

January 15, 1958, Mrs. Reynolds obtained a writ of execution ordering the sheriff to levy upon property of Mr. Reynolds to satisfy her judgment (in the divorce action) in the sum of $2,189.23. This sum comprised the aforementioned sum of $689.03 (one half of the community cash) and three months' alimony at the rate of $500 per month. On the same day her attorney, Mr. Moore, obtained a writ of execution ordering the sheriff to levy upon property of Mr. Reynolds to pay the judgment of $1,250 attorney's fees in the divorce action.

The sheriff served the writs on Standard. Standard made returns to the effect that it did not have in its possession or

under its control "any shares of the capital or common stock of the company belonging to, or standing in the name of, Robert P. Reynolds," but that the company's records showed that Mr. Reynolds was the record owner of 486 shares. Thereupon the sheriff purported to sell at public auction to Mrs. Reynolds the right, title and interest of Mr. Reynolds in and to 48 shares of Standard common stock standing in Mr. Reynolds' name, and to Mr. Moore the right, title and interest of Mr. Reynolds in 29 shares of such stock. He issued two certificates of sale, one to Mrs. Reynolds and one to Mr. Moore.

Standard refused to issue to Mrs. Reynolds and Mr. Moore new stock certificates pursuant to the certificates of sale, on the ground that the outstanding certificates had not been surrendered for transfer or cancellation. February 28, 1958, Mrs. Reynolds and Mr. Moore brought an action to compel the company to do so. This action and the quiet title action were heard together, with no evidence being presented other than oral stipulations of counsel, the file in the original divorce action, the letters of the three corporations rejecting Mrs. Reynolds' demands for issuance of the stock, Standard's return to the sheriff, and the by-laws of Standard.

■ This is the sole question necessary for us to determine: *Can a corporation be compelled to issue new certificates of stock when the old certificates are still in existence and have not been surrendered for cancellation, where (1) a trial court has decreed a plaintiff to be the owner of the stock as against the registered owner, or (2) a writ of execution has been levied upon a corporation which has issued stock in the name of the judgment debtor and the interest of the judgment debtor in the stock duly sold to the plaintiff?*

*No.* In the early history of this state there was no requirement that certificates be issued evidencing shares of stock in a corporation. Where they were issued, their possession was not essential to the ownership of the shares, the indicia of ownership of the shares being centered about the record on the corporate books. (Stats. 1850, ch. 128, § 12, p. 348.)

However, problems arose, particularly among assignees, pledgees, and attachment and execution creditors. As the problems multiplied, so did the demand for freer negotiability, commensurate with the developing importance of corporate investment in the national economy.

In 1861 a new statute required the issuance of share certificates of railroad companies (Stats. 1861, ch. 532, § 14,

p. 614), but this requirement was not made to apply to corporations generally until the adoption of section 323 of the Civil Code in 1872.

In 1905 the Legislature enacted a law providing for the issuance of new share certificates when the existing ones had been lost or destroyed, on condition that the owner bring an action to have the missing certificates cancelled by the court. (Stats. 1905, ch. 391, § 1, p. 500.)

The importance of share certificates appeared in the judicial recognition of ownership in a bona fide purchaser whose title rested on the possession of stock certificates endorsed in blank. While purporting to recognize equities of the registered owner, the courts followed the commercial trend by upholding claims of bona fide purchasers when any basis of estoppel could be found to exist. (*Powers* v. *Pacific Diesel Engine Co.*, 206 Cal. 334, 340 et seq. [274 P. 512, 73 A.L.R. 1398] ; *Brittan* v. *Oakland Bank of Savings,* 124 Cal. 282, 289 [57 P. 84, 71 Am.St.Rep. 58].)

In the years preceding 1931 recognition that the Corporation Law of California had become antiquated and a definite hindrance to the development of business in California as compared with other states led to a widespread demand for modernization. (Ballantine, *Major Changes in California Corporation Law,* 6 State Bar J. (1931) 159.) This took two contemporaneous courses: (1) a demand for general overhauling of the California Corporation Law, and (2) a demand for adoption of the Uniform Stock Transfer Act. The latter, originally devised in 1909 and becoming widely adopted in the rest of the country, had given impetus to the freedom of business transactions by making corporate stock freely negotiable. This was its essence and purpose.

Consequently, the Legislature in 1931 enacted a new corporation law, with drastic changes from the old, incorporating the Uniform Stock Transfer Act with certain modifications. The key provision of the new law was that which defined, *exclusively,* the method of transferring title to corporate shares.

Prior to 1931 section 324 of the Civil Code provided that shares of stock might be transferred by endorsement and the delivery of the certificate. It was held that this method was permissive only, and not exclusive, and that shares might be transferred by assignment or bill of sale or any other means by which intangible property may be transferred. It also provided that such transfer was not valid, except as

between the parties, until duly registered on the books of the corporation. (Ballantine & Sterling, California Corporation Laws (1949 ed.), § 231, p. 300.)

In 1931 a new section, 330.1 of the Civil Code, superseded the former section 324. In its present form, as section 2466 of the Corporations Code, it provides: "Title to a certificate and to the shares represented thereby can be transferred only in the manner specified in one of the following subdivisions:

"(a) By delivery of the certificate endorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby.

"(b) By delivery of the certificate and a separate document containing a written assignment of the certificate, or a power of attorney to sell, assign, or transfer the certificate or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person.

"(c) By delivery of the certificate with an assignment endorsed thereon or in a separate instrument signed by the trustee in bankruptcy, receiver, guardian, executor, administrator, or other person duly authorized by law to transfer the certificate on behalf of the person appearing by the certificate to be the owner of the shares represented thereby.

"The provisions of this section shall control although the charter or articles of incorporation or by-laws of the corporation issuing the certificate, or the certificate itself, provide that the shares represented thereby shall be transferable only on the books of the corporation or shall be registered by a registrar or transferred by a transfer agent."

The immediate effect of the new law was that the indicia of stock ownership now centered in the stock certificates. As a result, for example, a bona fide purchaser of an endorsed stock certificate whose title was acquired even from a thief or a finder would acquire a good title to the shares. (Corp. Code, § 2468; Ballantine & Sterling, California Corporation Laws (1949 ed.), § 238, pp. 304-306.)

Subsequent transfers of an endorsed certificate were made to override even prior lawful changes of title, extinguishing the title of a prior transferee of the shares without possession of the certificates (Corp. Code, § 2467) or the title of a prior owner who had lawfully rescinded an earlier transfer in the chain of title (Corp. Code, § 2471).

As the control of stock ownership moved away from the corporation's stock register and toward the free handling of stock certificates, business necessities demanded, and the Legislature granted, the necessary protection to the corporation. A major part of this protection, stated in section 2477 of the Corporations Code and adapted from section 13 of the Uniform Stock Transfer Act, is expressed in these simple, direct terms: "A corporation *shall not be compelled* to issue a new certificate for shares until the old certificate is surrendered to it, except when a certificate has been lost or destroyed, or the shares evidenced by a certificate have been sold for a delinquent assessment or nonpayment of the subscription price." (Italics added.)

Protection of the corporation in the case of lost or destroyed stock certificates also took a new form in 1931. From the Uniform Stock Transfer Act the Legislature took the provision permitting a corporation to issue a new certificate in place of one claimed to be lost or destroyed, but further permitting the corporation to require the owner of the lost or destroyed instrument to give the corporation an adequate bond or other security as indemnity against any claim that might be made against the corporation should the old certificate turn up. (Corp. Code, § 2481, adapted from Civ. Code, § 330.17—§ 17 of the Uniform Stock Transfer Act.) It also provided that the owner of a lost or destroyed certificate could bring an action to compel the issuance of a new certificate, and in such action the court could so order, but must order as a condition that the plaintiff should deposit adequate security "to protect and indemnify the corporation, its transfer agents and registrars, and also any person having any rights under the certificate alleged to be lost or destroyed, against loss, expense, or liability." (Corp. Code, §§ 2481-2485, inclusive.[1])

Also in 1931 the Legislature paid heed to the problem of protecting the corporation in the event of adverse claims to shares of its stock. By section 328 of the Civil Code (now Corp. Code, § 2409) a corporation doubting the right of a

---

[1]From 1931 to 1947, these sections were section 330.18 of the Civil Code, taken from section 18 of the Uniform Stock Transfer Act. They appear to duplicate the substance of sections 2417 to 2420, inclusive, of the Corporations Code, which from 1931 to 1947 were parts of section 329 of the Civil Code. Before 1931, these subjects were covered, respectively, by Civil Code, section 328 (stock), originating in 1905 (Stats. 1905, ch. 391, p. 500), and section 329 (bonds), originating in 1907 after the San Francisco earthquake and fire (Stats. 1907, p. 116).

person requesting a transfer of shares on its books, before recording the transfer or issuing a new certificate, could condition such transfer upon the giving of adequate security or a bond of indemnity. Under section 328a of the Civil Code (now Corp. Code, § 2410) a corporation transferring shares on its books at the instance of a person presenting a certificate was protected as to any adverse claimant unless the latter gave written notice of his claim and within five days thereafter gave adequate security or bond of indemnity.

At the outset, shares of stock were not capable of seizure, attachment, or execution at all. By statute in 1851, the California Legislature made corporate shares subject to attachment or execution by leaving with an official of the corporation a notice of the attachment (Stats. 1851, ch. IV, § 124, p. 69), but almost immediately problems arose.

After some uncertainty in the law regarding the respective rights of a pledgee and a purchaser at an execution sale, it had become settled prior to 1931 that as between a bona fide purchaser at such a sale and a prior transferee of the certificates, the purchaser at the execution sale should prevail if the shares were standing on the books of the corporation in the name of the judgment debtor, since the transferee could have protected himself by having his interest noted on the books of the corporation pursuant to former section 324 of the Civil Code (*Security etc. Bank* v. *Imperial W. Co. No. 1,* 183 Cal. 488, 494 [1] et seq. [192 P. 22]; *Spreckels* v. *Nevada Bank,* 113 Cal. 272, 276 et seq. [45 P. 329, 54 Am.St.Rep. 348, 33 L.R.A. 459]; *American T. & B. Co.* v. *Union S. Co.,* 43 Cal.App. 126, 129 [184 P. 508]), but that if a transferee from a debtor had noted his interest on the books of the corporation prior to an attachment by a creditor, the attachment would not be effective, since there would be no interest of the debtor remaining in the shares attached. (*Richman* v. *Bank of Perris,* 102 Cal.App. 71, 88 [8] et seq. [282 P. 801].)

The decisions prior to the adoption of the Uniform Stock Transfer Act in California in 1931 accorded with the basic rule that the corporate books were the bible of ownership and served as notice to all the world.[2]

---

[2]This theory of constructive notice, of course, embraced a fundamental fallacy. As this court stated in *National Bank of Pacific* v. *Western Pac. Ry. Co.,* 157 Cal. 573, 581 [108 P. 676, 21 Ann.Cas. 1391, 27 L.R.A. N.S. 987]: "It may be remarked further that the reason given, as above stated, in the first Weston case, for the rule there adopted, had no foundation in the law then in force and has none under the present law. It was founded on the notion that 'the stock and transfer book' of a corporation

■ The adoption of the Uniform Stock Transfer Act changed the basic rule. As shown above, California's incorporation of this law into the code in 1931 made stock certificates largely negotiable instruments. (Ballantine, *Major Changes in California Corporation Law, supra,* 6 State Bar J., pp.159, 161.)

The effect of the new law giving predominant importance to negotiability of the certificates, rather than to transfer on the corporate books, became at once apparent. In 1935 it was held in *Clark* v. *Western Feeding Co.,* 10 Cal.App.2d 727, 729 [52 P.2d 991], that since there was no longer any requirement under the new Uniform Act that the transferee notify the corporation of his transfer, a pledgee to whom a duly endorsed stock certificate had been delivered would obtain a title superior to that of a subsequent attaching or execution purchaser.[3]

■ The terms of section 2477 of the Corporations Code, set forth above, could hardly be more explicit. There can be no misunderstanding of its words or of their application to the present cases.

The prayer of the complaint in the quiet title action was that the three defendant corporations be ordered to issue new certificates to Mrs. Reynolds and in the other action that Standard be ordered to issue new certificates to her and Mr. Moore. Without dispute, there was no surrender of the old certificates or a showing that any of the statutory exceptions applied. The judgments directing the issuance of new certificates without requiring a surrender of the old conflict with the statute as clearly as they possibly could; they

---

is made a public record, accessible to all persons, intended to give notice to everybody of the *status* and ownership of the title to the stock, and that it is therefore available to the creditors of the stockholders and to persons dealing with them with respect to the stock. This is the law of some of the states where the rule contended for by the defendant prevails, but it is not the law of this state. (Civ. Code, § 378.) It was not the law with respect to mining corporations at the time the Weston cases were decided. (Stats. 1850, p. 368, § 144; Stats. 1853, p. 90, § 18.) The creditors of the individual stockholders have no such right of access, and the books could not constitute notice to them. Nor could these books hold any person out to the world as the owner of any stock, since the world could not have access thereto. Stockholders and creditors of the corporation are the only persons who have the right to inspect the books. (Civ. Code, § 378.)''

[3]Ballantine notes that *Spreckels* v. *Nevada Bank, supra,* ''is no longer law.'' (Ballantine & Sterling, California Corporation Laws (1949 ed.), § 237, p. 304, n. 120.) The cases following its doctrine, of course, share its demise.

order the corporations to do exactly what the statute says they shall *not* be compelled to do.

Whenever the question has arisen in other jurisdictions which have adopted this provision of the Uniform Stock Transfer Act, the courts have consistently held that they have no such power, as attempted to be exercised by the court below, to compel issuance of new, duplicative certificates. (For example, *Knight* v. *Shulz,* 141 Ohio St. 267 [47 N.E.2d 886, 890 [5], 150 A.L.R. 138] ; *Sherman* v. *Sherman,* 259 App.Div. 1092 [21 N.Y.S.2d 301, 302] ; *Luks* v. *Luks,* 106 N.J.Eq. 160 [150 A. 346, 347 [1, 2]]. To the same effect, see 12 Fletcher, Cyclopedia of Corporations (1957 rev. vol.) § 5537, p. 608 ; 1 Christy, The Transfer of Stock (3d ed. 1958) § 249, pp. 20 :1, 20 :2-20 :3.)

Christy thus states the rule and the practical necessities underlying it : ''One of the primary rules for the transfer of stock is that the outstanding certificate must be surrendered and cancelled before the stock represented thereby is transferred and a new certificate issued. This requirement is necessary to uphold the trading value of stock certificates. It has been said that, 'by thus making stock transferable by mere delivery of the certificate the law has intended to interdict corporations from transferring stocks on their books, except upon surrender of the certificate, or upon proof of its loss or destruction. These certificates of stock have become such important factors in trade and credit that the law has intended to surround those who take them with the safeguards it accords to the holders of the other great agencies of commerce—bills, notes, bills of lading, etc.' '' (1 Christy, The Transfer of Stock (3d ed. 1958) § 42, p. 6 :3.)

California did not adopt all of the Uniform Stock Transfer Act, but it did adopt the essential provisions—those requiring delivery of the certificate to transfer title to the shares (Corp. Code, §§ 2466, 2473), those protecting bona fide purchasers and holders of the certificates (§§ 2467-2471), those protecting the corporation against compulsion to issue new certificates without surrender of the old (§ 2477), and those requiring a bond or security before compelling the corporation to issue new certificates in place of lost or destroyed ones (§§ 2481-2485).

The theme of the Uniform Stock Transfer Act, both in its original form and as adopted in California, is negotiability of the certificates; and this cannot exist unless there

is only one certificate for given shares, carrying with it the ownership of the shares themselves.

The Supreme Court of Washington has stated: "[O]ne of the purposes of the Uniform Stock Transfer Act . . . was to make certificates of stock, in so far as possible, representative of the shares and thereby obviate the necessity of changing the registration of stock on the books of a corporation in order to make an effective transfer or sale of the stock (citations)." (*Fuller* v. *Ostruske,* 48 Wn.2d 802 [296 P.2d 996, 1003].)

California is in accord. Thus, it was held in *East Coalinga Oil etc. Corp.* v. *Robinson,* 86 Cal.App.2d 153, 159 [194 P.2d 554], "Nevertheless, due to the peculiar characteristics of negotiable instruments, into which class stock certificates have been placed by the Uniform Stock Transfer Act, an unimpeachable title may be transferred and vested in an innocent purchaser for value and without notice by one having no title himself."

Section 2477 is as explicit in the exceptions which it permits as in the general rule which it declares. The only exceptions relate to lost or destroyed certificates, or sales for delinquent assessments or nonpayment of the subscription price.

There is no intimation that any of these exceptions apply to the case at bar. There was no allegation or finding that the old certificates had been lost or destroyed, or that the shares in question had been sold for delinquent assessment or nonpayment of the subscription price. In fact, it is understood and assumed that the certificates are in existence outside the State of California.

With the only exceptions so explicitly specified, there is no room for the court to write in additional exceptions. (*Stockton Theatres, Inc.* v. *Palermo,* 47 Cal.2d 469, 476 [4] [304 P.2d 7]; *Adams* v. *Herman,* 106 Cal.App.2d 92, 104 [15] [234 P.2d 695]; *In re De Neef,* 42 Cal.App.2d 691, 694 [3, 4] [109 P.2d 741].) Moreover, as appears from a consideration of the rest of the California Corporation Law, the entire pattern of the law provides for issuance of new certificates without surrender of the old only in specified exceptional instances,[4] otherwise only upon surrender of the old certificates.[5]

---

[4]Corp. Code, §§ 2417-2420, inclusive, and 2481-2486, inclusive.

[5]*E.g.,* Corp. Code, §§ 2408, 2410, 2412, 2467-2469, 2471-2473, 2477, 2480.

What Mrs. Reynolds and Mr. Moore seek to acquire in these actions, and what the court has ordered issued to them, is a title *in rem*—negotiable instruments carrying title good as against all the world.

 The certificates of sale issued by the sheriff at the execution sale, however, purport to transfer only "all the right, title and interest of said judgment debtors [Robert Perrin Reynolds] in and to" the respective shares of stock. This is all the sheriff could validly have transferred, as the attachment and execution provisions of the Code of Civil Procedure have never gone further than to effect the seizure and sale of the debtor's right, title and interest. Through them, a creditor can acquire such interest as the debtor then has—no more. A sheriff's sale has the effect of a quitclaim, not a warranty deed. (*Noble* v. *Beach,* 21 Cal.2d 91, 94 [130 P.2d 426].)

The vice of the situation is that neither the court nor the parties know whether *any* title to the shares could have passed by the sheriff's sale. If Mr. Reynolds had already sold the shares, or had pledged or assigned them, the sheriff's sale could not possibly have transferred any ownership to Mrs. Reynolds or Mr. Moore, because Mr. Reynolds would have had none to seize.

 In adopting the Uniform Stock Transfer Act, California did not adopt the first sentence of section 13,[6] but retained the attachment and execution provisions of the Code of Civil Procedure (§§ 542, 688, 699). But the decision of the Legislature not to adopt the first sentence of section 13 cannot possibly indicate that the Legislature intended an exception (unexpressed) in the second sentence of section 13, which it did adopt (now Corp. Code, § 2477). On the contrary, the fact that the Legislature had both matters (exceptions and the issuance of new certificates) specifically before it and proceeded to enact the second sentence of section 13 *without* writing in an exception is conclusive that it intended none.

Since California did not adopt the first sentence of section 13, our law with respect to attachment or levy upon shares of stock remains as before, and accordingly it is not necessary that the certificates be actually seized by the officer making the attachment or levy. (Code Civ. Proc., § 542; *Partch* v. *Adams,* 55 Cal.App.2d 1, 5 [2] [130 P.2d 244].)

---

[6] "No attachment or levy upon shares of stock for which a certificate is outstanding shall be valid until such certificate be actually seized by the officer making the attachment or levy, or be surrendered to the corporation which issued it, or its transfer by the holder be enjoined."

The levy in the present case, therefore, was a valid one, and Mrs. Reynolds and Mr. Moore thereby became substituted to all the right, title and interest of Mr. Reynolds in the shares sold to them, as far as that interest is within Standard's control. Thus, Standard will be protected in paying the dividends to Mrs. Reynolds and Mr. Moore, and not to Mr. Reynolds. (Corp. Code, § 2465; *Perkins* v. *Benguet Consol. Min. Co.*, 55 Cal.App.2d 720, 738 [132 P.2d 70]; *Harris* v. *Mid-Continent Life Ins. Co.*, 75 Okla. 105 [182 P. 85, 87].) In addition, Mrs. Reynolds and Mr. Moore will be entitled to receive notice of meetings and to vote at meetings (Corp. Code, §§ 2214, 2215), and they will be entitled to inspect Standard's books and records (Corp. Code, § 3003).

There is nothing in the law which entitles the purchaser at a valid execution sale to the issuance of a new certificate without the surrender of the outstanding certificate. The rule is stated in Ballantine & Sterling, California Corporation Laws (1949 ed.), section 244, page 312, as follows: "A certificate of sale from the sheriff will convey the right of the debtor, but will no longer entitle the execution purchaser to a new certificate for shares from the corporation until the old certificate is surrendered to the corporation [citing *Harris* v. *Mid-Continent Life Ins. Co.*, 75 Okla. 105 [182 P. 85], noted in 33 Harv. L. Rev. 109; *Luks* v. *Luks*, 106 N.J. Eq. 160 [150 A. 346].]"

In the rule which it adopted relating to the specific matter of the issuance of new certificates, the Legislature pointedly did *not* make any exception for execution purchasers. The obvious reason is that new certificates, since the adoption of the Uniform Stock Transfer Act in California, represent *title in rem*, while under the attachment and execution statutes there can be a conveyance of only the debtor's right, title and interest—a quitclaim.

Without the stock certificates, Mr. Reynolds has no right to alienate or dispose of his interest. In other words, at no time can Mr. Reynolds alienate or dispose of his stock interest without delivering the endorsed certificates, and Mrs. Reynolds and Mr. Moore cannot acquire rights of transferability without the stock certificates. Through the execution sale, they acquired the precise right, title and interest which Mr. Reynolds had at the moment of levy. Thus, they could have acquired no more than the rights accorded to the registered owner, plus the right to transfer the stock

*on a surrender of the certificates.* Mr. Reynolds never had any superior right.

Likewise, in the quiet title action the judgment was that Mrs. Reynolds' title to the shares awarded her in the divorce action as her half of the community property "is quieted against any and all claims of every kind, character and description that said Robert Perrin Reynolds may have into [*sic*] said shares of stock." The judgment nevertheless directed that new certificates be issued to Mrs. Reynolds.

Since the judgment purported merely to quiet Mrs. Reynolds' title to the shares as against Mr. Reynolds, there was no basis for decreeing that new certificates, representing title good as against all the world, be issued to her, without requiring surrender of the outstanding certificates in accordance with the terms of section 2477 of the Corporations Code.

The judgments are reversed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., White, J., and Coughlin, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.