[Civ. No. 18229.   First Dist., Div. One.   Nov. 25, 1959.]

REGINALD FRANK BATE et al., Appellants, v.
AGNES MARSTELLER et al., Respondents.

Dodge & Evans and Robert P. Brorby for Appellants.

Jerome L. Schiller for Respondents.

FOLEY, J. pro tem.*—Appellants have appealed from a judgment in favor of respondents in an action brought to recover damages for alleged fraud in a real estate transaction.

Appellants were the owners of an apartment house in San Francisco. Having become financially involved, they decided to sell the property which had become heavily encumbered. They authorized respondent Arnold S. Gridley, Sr., doing business as Gridley Realty Company to procure a purchaser for said property. At that time and at all times mentioned herein respondents Agnes Marsteller, Burton Graham, and Arnold A. Gridley, Jr., were servants, agents, and employees of said realty company and were acting in the course and scope of their employment with full knowledge, consent and ratification of Gridley, Sr. The above named defendants-respondents will hereafter be referred to collectively as the brokers.

At the time they originally procured authorization to sell the property, the brokers were informed that appellant owners were in financial difficulties and that it was necessary for them to dispose of the property. Appellants informed the brokers that they desired to sell the property for $50,000 and that they should ask $52,500 for it. On many occasions the brokers showed the property to prospective purchasers and received

*Assigned by Chairman of Judicial Council.

many telephone inquiries concerning the property but they were unable to sell it.

Plaintiffs withdrew the property from sale for several months and then replaced it with the Gridley Company. Thereafter the brokers advertised the property for sale in local newspapers for $52,500 and later for $45,000.

Defendant Graham called on defendants Strombergs and told them that if they would make an offer of $37,000 for the property he believed the owners would accept it.

On November 4, 1955, the Strombergs executed a Uniform Agreement of Sale and Deposit Receipt in which they offered to buy the property for $37,000 and on the same day gave Graham a $500 deposit. At this time the Strombergs indicated to Graham that they might require his financial assistance or his participation in the transaction.

The sales agreement which also provided for the payment by plaintiffs of a $1,500 broker's commission was submitted to plaintiffs who signed it on November 7, 1955. On behalf of Gridley Realty Company, Graham at the same time signed the document in plaintiffs' presence.

Also on November 7, 1955, the Strombergs executed a letter agreement whereby, as additional consideration, plaintiffs were to be permitted to remain rent free in the apartment then occupied by them until November 30, 1956. The rental value of this apartment was $100 per month. This brought the sale price to $38,200.

On November 8, 1955, Graham placed the $500 deposited with him in escrow with City Title Insurance Company. The sales agreement provided that the deposit was required to be increased to 10 per cent of the sale price upon approval of the offer by the sellers. However, the Strombergs, after plaintiffs had approved the sale, declined to increase their deposit and on November 9, 1955, the brokers, themselves, deposited in escrow $3,200 by check, the balance due upon the deposit.

In her own name, defendant Agnes Marsteller initiated a request for a loan commitment, and, pursuant thereto, on November 16, 1955, an appraisal report was made by Mr. B. B. Howe, assistant secretary and treasurer of Surety Savings and Loan Association of San Jose. This appraisal reported a proposed sale price of $47,500 and a long term loan value of $42,900. As a result of this appraisal, a commitment for a loan in the amount of $30,000 was made by Surety to Marsteller in her name.

Sometime around the Christmas holidays of 1955, the Strombergs became dissatisfied with the transaction and were willing to lose their deposit rather than go through with the purchase. However, they requested Graham to assist them in order to avoid the loss of their $500 deposit if it were possible. Sometime during this same period, the brokers agreed to participate in the purchase.

On January 11, 1956, a formal request for a loan was made and Surety made the loan to Agnes Marsteller individually as purchaser.

On January 13, 1956, plaintiffs executed a grant deed of the property to the Strombergs and this deed acknowledged by Graham as a notary public on January 30, 1956, was deposited in escrow on January 31, 1956.

On this latter date the instructions of plaintiffs as sellers were deposited in escrow by Graham. These instructions showed a sale price of $37,000, and $1,500 brokers' commission. The buyer's instructions were deposited in escrow on behalf of and signed by Agnes Marsteller and showed a purchase price of $47,500.

A grant deed was then executed by the Strombergs conveying this property to Agnes Marsteller. This deed was acknowledged by Graham as notary public, as was a deed of trust executed by Marsteller for the benefit of Surety. This deed of trust dated January 13, 1956, secured two promissory notes totalling $30,000 also dated January 13, 1956, and executed by Marsteller in her own name.

It appears that while record title to the property was placed in the name of Marsteller, she holds such title for the benefit of herself, the Gridleys, and Graham to the extent of a total undivided ⅞ interest and for the benefit of the Strombergs to the extent of ⅛ interest.

On February 1, 1956, Graham placed an additional $800 in escrow on his own behalf and $300 on behalf of the Strombergs. These amounts added to the $500 cash and the $3,200 check already deposited made a total of $4,800 in escrow.

Thereafter Graham withdrew the $3,200 which had been placed in escrow but an additional $4,800 was then put in escrow on behalf of Gridley Realty Company and Marsteller on February 2, 1956, and this brought the total amount in escrow to $6,400, ⅞ of which had been placed there by the brokers on their own behalf. In other words, of the money in escrow, Graham put in $800, the Strombergs $800, Gridley $1,600, and Marsteller $3,200. The $30,000 obtained as a loan

from Surety by Marsteller was also placed in escrow on February 2, 1956. The Stromberg to Marsteller deed was also at the same time placed in escrow.

On February 2, 1956, the escrow was closed and copies of the sellers' closing statement showing a sale price of $37,000 were sent to Gridley Realty Company, but none were sent to plaintiffs. Copies of the buyers' closing statement showing a sale price of $47,500 together with title policy insuring Marsteller for $47,500 and a refund of $131.29 were sent to Marsteller; no copy of this statement was sent to plaintiffs.

After completion of the sale plaintiffs continued to live in the apartment for approximately 10 months. They requested an extension of their lease which request was denied by Gridley, Sr., in a letter dated October 2, 1956, in which he stated that the new owners desired occupancy of the apartment as of December 1, 1956.

The ultimate result of these transactions which were handled in one escrow was that the brokers became owners of $\frac{7}{8}$ of the property and the Strombergs became owners of $\frac{1}{8}$ thereof. The brokers were also paid a commission of $1,500 by the plaintiffs.

Appellants urge the following as grounds for reversal of the judgment: (1) The trial court's findings that the Strombergs were bona fide purchasers of the property on their own behalf are not supported by any substantial evidence; (2) The trial court's findings that the brokers made a full and complete disclosure to appellants and that appellants had knowledge of all material facts concerning the transaction are not supported by any substantial evidence; (3) The trial court's findings that appellants did not rely upon any representations made by defendants and at all times acted solely and only upon independent advice are not supported by any substantial evidence; (4) The trial court's findings that appellants after obtaining knowledge of the transaction ratified and confirmed the same is not supported by any substantial evidence; (5) The trial court's finding that the respondent brokers were entitled to a commission is against the law and evidence; (6) The trial court erred in finding that $37,000 was the best available market price for the property and that therefore appellants did not suffer any damages; and (7) The trial court erred in refusing to allow testimony as to the relationship between extended loan value and fair market value.

I. Is there any substantial evidence that the Strom-

bergs were bona fide purchasers of the property on their own behalf?

The answer to this question must be in the affirmative at least to the extent of a ⅛ interest in the property.

■ II. Is there any substantial evidence that the brokers made a full and complete disclosure to the appellants of all the material facts concerning the transaction and that appellants had full knowledge of all the material facts?

The answer to this question must be in the negative.

The most that the record discloses in this regard is that appellants were advised that the brokers would participate or were participating in the deal or transaction. Appellants were not advised or told how or to what extent the brokers were participating nor did they have any knowledge of the extent or manner of the brokers' participation.

There is no evidence in the record which would tend to show that the following material facts were ever disclosed by the brokers to appellants or that appellants had any knowledge thereof: (1) That Graham informed the Strombergs that if they would make an offer of $37,000 for the property he believed the owners would accept it when the property was being advertised for $45,000; (2) That the Strombergs declined to complete the 10 per cent deposit as required by the sales agreement; (3) That the brokers themselves put up the balance of the deposit; (4) That the Strombergs had become dissatisfied with the deal and were willing to forfeit their deposit rather than complete the transaction; (5) That in December 1955 the brokers decided to purchase for themselves a ⅞ interest in the property.

It was the positive duty of the brokers to have disclosed all of these facts to the appellants. The brokers were bound to fully disclose to appellants, their principals, any facts known to them which were material to the transaction and which might affect their principals' decision. They will not be allowed to deal in their own behalf with their principals with reference to the subject matter of the agency unless they make a full, complete, and honest disclosure of the truth of the transaction.

■ ''The relationship between a broker and his principal is fiduciary in nature, and imposes upon the broker the duty of acting in the highest good faith toward his principal. This duty of good faith precludes the broker from assuming a position adverse to that of his principal unless the principal consents. Moreover, it places upon the broker a legal obligation

to disclose to his principal all the facts within his knowledge which are material to the matter in connection with which he is employed." (9 Cal.Jur.2d 199.)

■ "When the acts of an agent have been questioned by his principal and the fiduciary relationship has been established, the burden is cast upon the agent to prove that he acted with the utmost good faith toward his principal [citations] and that he make a full disclosure prior to the transaction of all the facts relating to the transactions under attack. [Citations.]" (*Schwarting* v. *Artel,* 40 Cal.App.2d 433, 441 [105 P.2d 380].)

■ In the case of *Adams* v. *Herman,* 106 Cal.App.2d 92, 99 [234 P.2d 695], the court stated, "The fact that the agent may have paid a fair price for the property, or that the property could not then have been sold for a greater price, are false factors if a full disclosure, prior to sale, is not made."

Respondents rely upon the well recognized rule of law that a broker may purchase the property of his principal where there has been a full disclosure of the facts. However, this rule can have no application in the instant case because the defendant brokers did not make such full disclosure as the law requires.

The case of *Moody* v. *Osborne,* 120 Cal.App.2d 598 [261 P.2d 783], is not in point. The decision in that case holds that the mere fact that the broker personally loaned money to the purchasers to enable them to complete the transaction does not show that he was duplicitous in his dealings; the source of funds from which such payment was made is of no particular import so far as the sellers are concerned, and the fact that it was from funds advanced by the brokers does not make the transaction fraudulent as to the sellers.

The situation in the instant case is entirely different from that in the Moody case, *supra,* 120 Cal.App.2d 598. We are here concerned not with a loan by the brokers to the purchasers to enable them to complete the transaction but with a sale to the brokers.

■ Respondents further contend that because appellants expressed an absolute indifference in a participation by the brokers in the transaction and did not care who bought the property and did not care whether or not the brokers participated or did not participate, the brokers were relieved from the duty of making a full disclosure as to the extent of their participation. This contention is without merit. The brokers' knowledge of the appellants' critical financial con-

dition and of their apparent reliance upon the brokers to get the best possible price for the property would seem to indicate a most cogent reason why the brokers should have made a full and complete disclosure of all the material facts relating to the transactions.

■ III. Is there any substantial evidence that appellants relied upon advice independent of their brokers and did not rely upon any representations made to them by defendants?

The answer to this question must also be in the negative. Respondents attempt to uphold the trial court's findings by arguing that Mr. McNeil, an attorney and certified public accountant, was deeply involved in the transaction on behalf of appellants, that Mr. Bate, himself, canvassed the market, and that Mr. Bate had employed another broker to procure a buyer. Mr. McNeil's capacity was that of a tax adviser to appellants and while he advised the sale of the property to prevent its loss by foreclosure, there is no evidence in the record which would tend to show that he or appellants did anything but rely entirely upon the representations made to them by the brokers. Respondents' statement that Mr. Bate canvassed the market himself is unsupported by any evidence. The fact that various prospects may have called on Bate does not constitute a canvassing of the market. Although there was testimony that the Bates discussed a possible trade offer with a real estate broker named Wertheim who showed the property, there is no evidence to the effect that they relied upon any advice of said broker or that he gave any.

■ IV. Is there any substantial evidence that appellants after obtaining knowledge of the transactions ratified and confirmed the same?

The answer to this question must also be in the negative. Appellants continued to live on the property and requested an extension of their lease after they learned that the title was in the name of Marsteller. ■ "Ratification is essentially a matter of assent. Consequently, a principal is not bound by ratification unless he acts with knowledge of all the material facts involved in the unauthorized transaction, particularly with knowledge of the acts of the person who assumed to act as his agent. This knowledge is equally necessary whether the ratification be express or implied." (2 Cal.Jur.2d 743.) ■ Learning of the fact that title stood in the name of one of the brokers can hardly constitute knowledge of all the brokers' activities with respect to this transaction. The finding of ratification is unsupported because there is no

evidence from which it might reasonably be inferred that appellants remained in the apartment and requested an extension after they had obtained full knowledge of the brokers' acts.

V. Is the trial court's finding that respondent brokers were entitled to a $1,500 commission against the law and the evidence?

Yes, it is. We have hereinabove decided that there is not any substantial evidence that the brokers made a full and complete disclosure of all the material facts concerning the transaction to appellants. This it was their duty to do.

"If the broker breaches his duty of good faith, he is not only precluded from recovering compensation for his services, but may also be held liable for the damages caused by his fraud, or the fraud of his agent." (9 Cal.Jur.2d 200-201.) "The broker, of course, is not entitled to compensation where he purchases his principal's property for himself in violation of his fiduciary duties." (P. 205.)

VI. Did the trial court err in finding that $37,000 was the best available market price and the highest price obtainable for appellants' real property and in concluding that appellants have not been damaged by any action of respondents?

(a) The trial court did not err in finding that $37,000 was the best available market price and the highest price obtainable for the property. In this regard the record discloses only a conflict in the evidence which the trial court resolved in favor of respondents. On the question of value the expert testimony of three witnesses, two called by appellants and one by respondents, fixed the same at $50,000, $46,000, and $40,500, respectively. All these estimates are in excess of the $38,200 actually paid for the property. However, "The credibility and weight of expert testimony are exclusively within the province of the triers of the facts. . . ." (19 Cal.Jur.2d 37.)

In contrast to the above testimony, it is to be noted that the property was shown 30 or 40 times from the time it was first listed until the ultimate sale and that there were telephone inquiries in excess of that number but the brokers were unable to procure a purchaser at the price asked. Respondent Marsteller testified that the only affirmative offer received by her for the property was in the amount of $32,000.

(b) Insofar as the court concluded that appellants were not damaged in any sum whatever by any acts or actions of respondents, it was in error. Appellants were damaged at

least to the extent of the $1,500 commission paid by them to respondent brokers where under the evidence produced at the trial the brokers were not entitled to any commission.

VII. Did the trial court err in refusing to allow testimony as to the relationship between extended loan value and fair market value?

Appellants contend that the court committed error in refusing to allow a question of the witness Howe, who testified as to the market value of the property, as to whether there was a relationship between the extended loan value and the fair market value. While later on an appraisal of extended loan value was admitted into evidence, it does not appear that at the time the objection was sustained the matter was material. The ruling of the court under these circumstances was not erroneous.

Since the trial court's conclusion that the respondent brokers were not liable to appellants in any amount was based on findings unsupported by any substantial evidence, the judgment is reversed as to respondents Agnes Marsteller, Arnold S. Gridley, Sr., dba Gridley Realty Company, Burton Graham, and Arnold S. Gridley, Jr.

Appellants have failed to point out any legal ground, and we have found none, why the judgment should be reversed as to respondents Roland W. and Marion Stromberg. Therefore, the judgment is affirmed as to respondents Stromberg.

Bray, P. J., and Tobriner, J., concurred.

A petition for a rehearing was denied December 21, 1959.