[No. F005478. Fifth Dist. July 31, 1986.]

STEVE SCHMIDT & CO., Plaintiff and Respondent, v.
DAVID L. BERRY, Defendant and Appellant.

COUNSEL

Green, Green & Rigby and Denslow Green for Defendant and Appellant.

David P. Crawford and Richard I. Singer for Plaintiff and Respondent.

OPINION

**BROWN (G. A.), P. J.**—Defendant, David L. Berry (Berry), appeals from a summary judgment entered in favor of the plaintiff, Steve Schmidt & Co. (Schmidt & Co.), for $57,750, representing a real estate commission, plus attorney's fees and costs. Schmidt & Co., a licensed real estate broker, sued Berry, Darwin G. Shebelut (Shebelut) and Charles Tingey Associates, Inc. (Tingey),[1] seeking declaratory relief, damages for breach of contract and damages as a third party beneficiary.

---

[1]Shebelut and Tingey are not parties to the appeal.

## FACTS

The recited facts are gleaned from the uncontradicted evidence submitted by Schmidt & Co. in support of its motion for summary judgment and the declaration of Berry submitted in opposition to the motion for summary judgment.[2]

On about April 27, 1980, Berry (owner) and codefendant Shebelut entered into an exclusive listing agreement with Tingey, real estate broker, whereby Tingey was to obtain a buyer for a 72-unit apartment building in Madera, California. Pertinent portions of the listing agreement include the following: Section 5 of the listing agreement originally provided that Berry agreed to accept an offer produced by Tingey from a ready, willing and able buyer to purchase the property for a gross selling price of $1.6 million, on the following terms and conditions:

> "Owner hereby agrees that Owner shall accept an offer produced by Agent from a ready, willing, and able buyer to purchase the Subject Property for a gross selling price of One Million Six Hundred Thousand and no/100 Dollars ($1,600,000), on the following terms and conditions: Down Payment ÷ $320,000. Terms: *1,650,000.* ⁰⁰ *ONE SIX FIFTY . 6.3.*
>
> 1. Assume note for $494,475.37 at 12½% interest.
> 2. Assume note for $389,225.22 at 10 7/8% interest.
> 3. Buyer to execute a note in favor of the Seller for $396,299.41 @ 10% interest. Said note to be due in 7 years from close of escrow. Said note shall be paid on the following terms:
>    a. Payments for years one through three shall be deferred until the beginning of the fourth year.
>    b. Payments will then be made monthly interest only on the balance of $515,189.23 ($4,293.24 per month)
>    c. Balance is calculated by adding three years of interest only payment to the beginning principle balance."

At some point thereafter and before the acceptance by Schmidt individually, the agreement was modified and initialed by Berry to reflect an increase of $50,000 in the selling price, bringing the gross selling price to $1,650,000. There is no dispute that the correct price was $1,650,000. No corresponding increase in the downpayment or the terms of the note for the balance due was reflected in the listing agreement.

---

[2]Schmidt & Co. submitted the following: (1) a written "Agreement of Exclusive Authorization and Right to Sell," dated April 12, 1983, executed by the parties; (2) a declaration of Steve Schmidt; (3) a letter agreement to divide the commission, dated September 14, 1983, signed by Schmidt & Co. and by Tingey, also a real estate broker; (4) deposition of Jack L. Williams, real estate salesman for Tingey; (5) a letter dated September 6, 1983, from Steve Schmidt individually to Charles Tingey accepting the offer; (6) declaration of Walter Jitner, attorney for Schmidt & Co.; (7) deposition of Berry; (8) declaration of David P. Crawford, Attorney.

In addition, Berry made some admissions through his counsel, in a document submitted, entitled "Separate Statement of David L. Berry in Opposition to Plaintiff's Motion For Summary Judgment."

Section 10 states in pertinent part:

"(a) Agent is authorized to accept and hold on Owner's behalf a deposit from any prospective buyer pending submission of the proposal to Owner.

"(b) Owner agrees, as seller, to provide evidence of marketable title to the Subject Property in the form of a California Land Title Association Standard Owner's Policy of Title Insurance, in the amount of the agreed-upon selling price.

"(c) Owner hereby authorizes Agent to cooperate with other brokers, salesmen, and subagents, and to divide with them any commission or other compensation due under this Agreement.

"(d) In the event either party to this Agreement finds it necessary to institute legal proceedings to enforce the provisions of this Agreement, the prevailing party in said suit or action shall be entitled to recover from the nonprevailing party, all costs associated with such suit or action, including reasonable attorneys' fees."

Pursuant to the authorization contained in section 10, subdivision (c), during the latter part of August 1983, defendant Tingey entered into a written letter agreement with Schmidt & Co. providing that if Schmidt & Co. obtained a buyer ready, willing and able to purchase the subject property, the $99,000 commission would be divided as follows: $57,750 to Schmidt & Co., and $41,250 to Tingey. $99,000 is 6 percent of a gross selling price of $1,650,000.

Thereafter, and during the term of the listing agreement, Steve Schmidt, individually, and not on behalf of Schmidt & Co., offered $1,650,000, reflecting agreement with the $50,000 increase in the purchase price that had been added by Berry. The offer also reflected an increase of $50,000 in notes payable to seller Berry. The offer was contingent on a number of provisions which do not appear in the listing agreement, such as inclusion of personal property, compliance of buildings with building code, physical inspection of the property, warranties, etc.

Berry responded with a counteroffer which contained a number of provisions not included in the original listing agreement, including a limitation on the number of inspection visits that could be made by Schmidt, provisions for a quitclaim deed if payments became overdue 30 days, and others.

Schmidt, displeased with the counteroffer, replied in relevant part: "Your response suggests several conditions which are not set forth in your listing

agreement and are not acceptable to me. The purpose of this letter is to advise you that I hereby accept your offer to sell the above referred to property on the exact terms in your listing agreement (Agreement of Exclusive Authorization and Right to Sell)."

Berry refused to sell unless the terms contained in his counteroffer were incorporated in the sales contract. This lawsuit by Schmidt & Co. for its share of the commission followed.

## DISCUSSION

### THE TERMS OF THE CONTRACT AND SCHMIDT & CO.'S OBLIGATION THEREUNDER

■ A listing agreement is a contract of employment between the property owner and his broker-agent; the parties are entitled to make the broker's employment and his right to compensation depend upon any lawful condition that they agree to insert in the agreement, and the listing agreement is strictly construed according to its terms. (*Blank* v. *Borden* (1974) 11 Cal.3d 963, 969, 972, fn. 8 [115 Cal.Rptr. 31, 524 P.2d 127]; *Seck* v. *Foulks* (1972) 25 Cal.App.3d 556, 571-572 [102 Cal.Rptr. 170].)

The agreement may provide that no commission shall be earned until the happening of a specific event or contingency or upon certain defined terms and conditions, such as consummation of the sale, or upon receipt of funds by the seller from an escrow. (*Devereaux* v. *Harper* (1962) 210 Cal.App.2d 519, 526 [26 Cal.Rptr. 837]; *Silva* v. *Goldman* (1931) 117 Cal.App. 423, 426 [4 P.2d 191]; 1 Miller & Starr, Current Law of Cal. Real Estate (1975) § 2:19, pp. 207-212.)

■ A common type of listing agreement is one such as the one in the instant case, wherein the broker agrees to produce a buyer ready, willing and able to purchase the described property on the terms and conditions set forth in the listing and the seller agrees to accept the offer on the terms set forth in the agreement. Under such an agreement, it is well settled the broker's commission is earned upon the production of a ready, willing and able buyer. The listing agreement at bench complies with this model. It provides: "Owner hereby agrees that Owner shall accept an offer produced by Agent from a ready, willing, and able buyer to purchase the Subject Property . . . on the following terms . . ." and that "Agent agrees to use Agent's best efforts and due diligence to procure a ready, willing, and able buyer for the Subject Property on the terms set forth [herein]."

Witkin states the general rule as follows: "The broker or agent is ordinarily entitled to the commission when he produces a purchaser, *ready, able and*

*willing to buy* the property for the price and on the terms specified by the principal, regardless of whether a valid contract of sale is entered into by the buyer and seller, or whether the sale is ever consummated." (1 Witkin, Summary of Cal. Law (8th ed. 1973) § 247, pp. 831-832.) (See also *Seck* v. *Foulks, supra,* 25 Cal.App.3d 556, 571-572; 1 Miller & Starr, Current Law of Cal. Real Estate, *supra,* § 2:18, p. 205.) Hence, if a prospective buyer makes an offer to purchase the property on the express terms of the listing agreement, the broker will earn his commission even though the owner's willingness to sell is conditioned on a term not contained in the listing agreement. (*Williams* v. *Freeman* (1939) 35 Cal.App.2d 104, 107-108 [94 P.2d 817]; *McAlinden* v. *Nelson* (1953) 121 Cal.App.2d 136, 139 [262 P.2d 627].)

When the broker produced Schmidt individually, who was ready, willing and able to purchase the property on the terms stated in the listing agreement, Schmidt & Co. had earned its commission; seller could not thereafter demand additional terms or modifications of the agreement. (*Seck* v. *Foulks, supra,* 25 Cal.App.3d 556, 571-573.) Further, the right to the commission is not affected by failure of either party to carry out the agreement. (*Lipton* v. *Johansen* (1951) 105 Cal.App.2d 363, 369 [233 P.2d 648].)

In the instant case there is nothing in the listing agreement to indicate Schmidt & Co.'s commission was conditioned upon a meeting of the minds of the seller and the buyer upon any terms other than or in addition to those set forth in the listing agreement.

Berry's declaration in opposition merely sets forth that the listing agreement "did not contain essential provisions that must be agreed upon before there is an agreement of sale," and that "[t]he terms set forth . . . are so incomplete as to afford no basis upon which a sale could be made." These statements reflect a misunderstanding of the law.

The terms of the listing agreement include a description of the property, name of the owner, selling price, a provision for title insurance, and terms and conditions of payment of the price. These satisfy the essential elements of a contract of sale. While additional terms, such as escrow provisions, closing date and details concerning possession, etc., have become common in modern real estate transactions, they are not essential to a contract. Accordingly, while those terms characterized by Berry as essential terms of sale are important, material and desirable and very likely to be subject to negotiation prior to consummation of any contract of sale, a meeting of the minds on these terms is not essential to Schmidt & Co.'s entitlement to a commission.

## Ambiguity in the Terms of Payment of the Purchase Price

■ Appellant contends that summary judgment should not have been granted because there was a factual issue as to the terms of the sale. Specifically, when the purchase price was raised from $1.6 million to $1,650,000, a corresponding increase was not made in either the down-payment or the balance due to be represented by a note; hence Berry maintains there is a factual issue as to the terms of the sale to which Schmidt agreed when he offered to purchase the property in accordance with the terms of the listing agreement.

Contrary to appellant's contention, there is no question of fact as to the purchase price. The listing agreement clearly reflects an increase in purchase price from $1.6 million to $1,650,000. The agreement between Tingey and Schmidt & Co. regarding split of the commission reflects a commission of $99,000, 6 percent of $1,650,000. Schmidt's offer reflects a purchase price of $1,650,000 and a corresponding increase in the balance due by $50,000.

Moreover, the terms of payment are immaterial to the broker's entitlement to a commission which is calculated upon the total purchase price, not upon the terms of the sale. In any suit between the buyer and the seller any ambiguity as to whether the $50,000 was to be paid as part of the down-payment or as part of the balance could easily be established by parol evidence. (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40 [69 Cal.Rptr. 561, 442 P.2d 641]; *Russell* v. *Ramm* (1927) 200 Cal. 348, 368-370 [254 P. 532]; *Rivers* v. *Beadle* (1960) 183 Cal.App.2d 691, 695-696 [7 Cal.Rptr. 170].)

## Was Schmidt an Able Buyer?

Berry argues that a factual issue exists as to whether Schmidt was an able buyer.

"[A] purchaser is . . . 'able' when he has the legal capacity and the financial ability to purchase the property. 'Financial ability' means that he has sufficient resources available to him to consummate the transaction when the time comes for him to do so. Although the purchaser is not required to have the ready cash at the time he makes his offer, he must have sufficient property, credit or other assets at that time which will reasonably enable him to obtain the requisite funds at the prescribed time." (1 Miller & Starr, Current Law of Cal. Real Estate, *supra,* § 2:18, p. 202, fns. omitted; *Laack* v. *Dimmick* (1928) 95 Cal.App. 456, 470 [273 P. 50].)

■ The burden of proving ability initially rests with the broker. He must make a prima facie case. (*Russell* v. *Ramm, supra,* 200 Cal. 348, 352.)

In support of Schmidt's position that he had the ability to purchase the property, he submitted his own declaration which states: "During the first week of September 1983, I agreed to personally purchase the property set forth in the listing agreement (Exclusive Authorization and Right to Sell drafted April 12, 1983) upon the terms contained therein. . . . [¶] I invest and manage real estate for a living and have purchased numerous properties as large or larger than the property involved in this action and was and am fully able to complete the purchase set forth in the listing agreement."

Schmidt & Co. also submitted a declaration of Walter Jitner, its attorney, which states: "I encouraged STEVE SCHMIDT & CO. to enter into an agreement to share the real estate commission with CHARLES TINGEY ASSOCIATES, INC., and thereafter assisted Steve Schmidt in his personal decision to purchase the property under the terms set forth in the listing agreement. . . . [¶] I have worked with Mr. Schmidt for approximately three and one-half years, have participated with him in the purchase of several large rental properties and am aware that Mr. Schmidt has and continues to have the ability to purchase the Madera property on the terms set forth in the listing agreement."

Further, Berry, during his deposition, admitted:

"Q: Mr. Berry, do you have any reason to believe that Mr. Schmidt was not able to purchase the property?

"A: I had no reason to assume that.

"Q: Did you have any information at all regarding his ability to purchase the property?

"A: No.

"Q: Is it your position that Mr. Schmidt was not willing to purchase the property?

"A: No.

"Q: Do you believe he was willing to purchase the property?

"A: I assume he was. Everything indicates that.

"Q: Do you also believe that he was also ready to purchase the property?

"A: I believe that it was probably his intent to follow through as far as he could."

Berry submitted no declaration bearing on Schmidt's ability to purchase the property. If Berry needed more time to develop such evidence, the court, if requested, would have been required to give it to him. (Code Civ. Proc., § 437c, subd. (h).) Additional time was not asked for. The evidence submitted is certainly sufficient to establish a prima facie case of ability. Accordingly, on this record, there is no issue of fact in this regard. Moreover, we note that Berry did not raise the issue of ability in the trial court in opposition to the motion for summary judgment. The issue was raised by his codefendant, Shebelut, who is not a party to this appeal.

### WAS THE OBLIGATION TO PAY THE COMMISSION CONDITIONED UPON THE CLOSING OF ESCROW?

Referring to section 6 of the listing agreement, Berry contends the obligation to pay a commission was conditioned upon the closing of escrow. Section 6 in relevant part provides: "Owner shall pay a commission to Agent equal to six percent (6%) of the gross selling price of the Subject Property. Said commission shall be paid in full at the close of escrow, whether or not said escrow closes within the term of this Agreement."

Schmidt & Co. argues that this language does not set forth a condition for entitlement to a commission but a limitation on the time of payment.

The declarations and other evidence submitted by Berry contain no reference to or extrinsic evidence of the intention of the parties regarding the meaning of this language. Schmidt & Co. introduced the deposition of Jack Williams, salesman for Tingey, who stated it was his intention in drafting the listing agreement that Tingey be entitled to a commission upon the attainment of a ready, willing and able buyer who was willing to purchase the property in accordance with the terms of the listing agreement. Since there is no conflict in the evidence, the interpretation of the section is one of law for the court. No issue of fact has been created. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 864-866 [44 Cal.Rptr. 767, 402 P.2d 839].)

In *Austin* v. *Richards* (1956) 146 Cal.App.2d 436 [304 P.2d 132], language very similar to the language at issue was construed as merely a provision limiting time of payment. In *Austin,* defendant seller, by written agreement dated March 6, 1954, granted plaintiff broker an exclusive right to sell

certain property and provided for a commission of 5 percent of the purchase price. On June 7, 1954, defendant entered into an agreement with buyer which provided defendant would pay broker "as commission the sum of '$10,000.00—(5000.00 *on close of Escrow* $5,000.00 Jan 4 1955 (Note.).'" (*Id.,* at p. 437, italics added.) Plaintiff broker initialed this provision as "'OK.'" The following day, an escrow was opened. The instructions contained the following: "'Commission: payable as follows:—$5,000.00 *at close of escrow* & $5,000.00 on January 4, 1955. . . .'" (*Ibid.,* italics added.) Seller rescinded the agreement. In a suit by broker to recover commission, the court construed this language as an absolute promise to pay commission. The court held: "The contract between defendant and [buyer] which plaintiff initialed expressly provided that $5,000 would be paid plaintiff 'on close of escrow' and $5,000 on January 4, 1955 to be evidenced by defendant's note. Construing the contract and the escrow instructions together, it is evident that the promise to pay was absolute and that 'on close of escrow,' 'at close of escrow,' and January 4, 1955, merely fixed the times for payment. The promise to pay was not contingent on the escrow's closing." (*Austin* v. *Richards, supra,* 146 Cal.App.2d at p. 440.)

█  In the instant case the obligation to pay the commission, as distinguished from the timing of the payment, became fixed at the time a ready, willing and able buyer was produced. Referring to the sequence of provisions in the agreement, immediately after fixing the terms of the agent's obligation (§ 3 of the listing agreement), the term of the authorization (§ 4) and the owner's obligation to accept an offer from a ready, willing and able buyer (§ 5 of the listing agreement), section 6 provides for the time of payment of the commission, that is, "at the close of escrow." As the court in *Austin* v. *Richards, supra,* 146 Cal.App.2d at page 440, concluded, "The promise to pay was not contingent on the escrow's closing." Any other interpretation drawn from the four corners of the listing would, in our opinion, be facially unsupportable. Our conclusion is substantiated by the deposition of Jack Williams who stated that in drafting the listing agreement the obligation to pay arose when a ready, willing and able buyer was produced.

Thus, we conclude that the failure of the escrow to close does not preclude Schmidt & Co. from collecting its commission.

The provisions of section 6, subdivisions a, b, c, d and e,[3] of the listing agreement under the facts before us do not affect the obligation of Berry

---

[3]Section 6, subdivisions a, b, c, d and e, of the listing agreement provides in part:

"Owner shall pay Agent a commission of six percent (6%) of the gross selling price which Owner is presently willing to accept, as set forth in Paragraph 5 hereinabove, in the event of the occurrence of any of the following during the term of this Agreement:

"a. The making of an exchange of the Subject Property (whether for an interest or a joint

which arose when Schmidt & Co. produced a ready, willing and able buyer. These subdivisions of section 6 describe other events upon the occurrence of any one of which the seller's obligation to pay the broker would arise. They are placed in the listing agreement for the protection of the broker. None of these provisions came into operation in this case and, contrary to Berry's contention, are irrelevant to the issues before the court.

## STANDING OF SCHMIDT & CO. TO SUE THE SELLER, BERRY

■ Berry argues that Schmidt & Co., as cooperating broker, was not entitled to sue Berry for its commission.

Section 10, subdivision (c), of the listing agreement provides: "(c) Owner hereby authorizes Agent to cooperate with other brokers, salesmen, and subagents, and to divide with them any commission or other compensation due under this Agreement."

Pursuant to paragraph 10, subdivision (c), Tingey and Schmidt & Co. entered into a written letter agreement which provided if Schmidt & Co. procured a buyer ready, willing and able to purchase the property under the terms of the listing agreement, the 6 percent commission would be divided $57,750 to Schmidt & Co. and $41,250 to Tingey.

■ No extrinsic evidence having been presented on this issue, the interpretation of the writing is a question of law for the court. (*Parsons* v. *Bristol Development Co.*, *supra*, 62 Cal.2d at pp. 864-866.) ■ The critical question is whether the language merely allowed Tingey to appoint sub-agents of Tingey who could not bind the principal, Berry, or if the language was sufficient to authorize Tingey to appoint subagents who could bind the principal, thus making Berry (the principal) directly responsible for the commission. (Civ. Code, §§ 2350, 2351.)[4]

---

venture, a partnership, a corporation, for other property or otherwise) or the entering into of a contract of sale therefor;

"b. a withdrawal of all or any part of the Subject Property from the market by Owner;

"c. the sale by Owner, either directly or indirectly, of all or any part of the Subject Property in violation of the terms of this Agreement;

"d. if by reason of the acts of Owner, all or any part of the Subject Property becomes unmarketable;

"e. if Owner orally agrees during the term of this Agreement, without Agent's prior written consent, to sell all or part of the Subject Property after the expiration of the term of this Agreement, in a willful attempt to defeat Agent's right to a commission hereunder."

[4]Civil Code section 2350 provides: "If an agent employs a sub-agent *without authority*, the former is a principal and the latter his agent, and the principal of the former has no connection with the latter." (Italics added.)

Civil Code section 2351 provides: "A sub-agent, *lawfully appointed*, represents the principal in like manner with the original agent; and the original agent is not responsible to third persons for the acts of the sub-agent." (Italics added.)

Commenting upon this subject, Miller & Starr instructs:

"The issue of the cooperating broker's right to collect a commission is a matter of contract. The issue is also one of equity. . . .

". . . Since the principal expressly authorized the use of sub-agents, the cooperating broker becomes the agent of the seller and the seller is the principal. ([Civ. Code] § 2351.) Thus, there is a principal-agent relationship between the seller and the cooperating broker (see § 4:18, infra), the principal has made a promise to pay compensation to the listing broker, and the principal knows that the cooperating broker will share in that commission and has acted in reliance upon the expectation of compensation from the seller.

". . . There is an express promise by the seller to pay a commission, the listing broker is authorized by the seller to engage sub-agents, and the listing broker, as the seller's agent, makes a representation to the cooperating broker to share the commission, which representation is made within the course and scope of his authority. Thus, the seller should be bound by the contract made by his own agent. In addition, there should be an implied promise to the cooperating broker to pay the commission to him since the seller knows of the listing broker's representation and the reliance by the cooperating broker. (See, by analogy, § 2:27, infra.)" (1 Miller & Starr, Current Law of Cal. Real Estate (1985 pocket supp.) § 2:23, p. 115, fn. 7.)

We agree with these comments. Any other result would be grossly inequitable where, as in the instant case, the listing broker does not wish to pursue the commission, presumably because of the future potential business relationship with the seller.

Berry relies upon *Goodwin v. Glick* (1956) 139 Cal.App.2d Supp. 936 [294 P.2d 192], a superior court appellate department case, which we find to be unconvincing. In concluding the authorization in the listing contract to employ subagents was not an authorization to employ agents who would become the agents of the principal, the *Goodwin* court relied primarily upon the language of the listing agreement naming the listing broker as the agent and indicating the commission would be payable to the agent. However, this line of reasoning would appear to be bootstrapping in that the very issue is whether the language authorized the listing broker to appoint sub-agents to the principal. Further, the holding is inconsistent with the statutory directive contained in Civil Code section 2351. (See fn. 4, *ante.*) For the foregoing reasons we do not choose to follow the *Goodwin* case.

Moreover, Schmidt & Co.'s complaint contained a cause of action based upon a third party beneficiary theory. It appears to us that Schmidt & Co. is on sound ground in this regard and that it has enforceable rights against Berry under this theory as a member of a class which was intended to be directly benefited by Berry's promise. (Civ. Code, § 1559;[5] *Sublett v. Henry's etc. Lunch* (1942) 21 Cal.2d 273, 274-275 [131 P.2d 369]; *Garratt v. Baker* (1936) 5 Cal.2d 745, 748 [56 P.2d 225]; *Lumber Co. v. E.G. Niemann Investments* (1929) 99 Cal.App. 456, 459 [278 P. 913].)

■ It is not necessary that the contract identify the third party by name as long as such third party can show that he is one of a class of persons for whose benefit it was made. (*Watson v. Aced* (1957) 156 Cal.App.2d 87, 91-92 [319 P.2d 83]; *Shell v. Schmidt* (1954) 126 Cal.App.2d 279, 290 [272 P.2d 82]; *Garratt v. Baker, supra,* 5 Cal.2d at p. 748.)

■ Again, there is no extrinsic evidence presented on this issue, leaving the issue of the intent of the parties to be one of law to be arrived at by construction of the language of the written documents. (*Parsons v. Bristol Development Co., supra,* 62 Cal.2d at pp. 864-866.)

■ Section 10, subdivision (c), of the listing agreement, *ante,* contains express language recognizing the interest of "other brokers, salesmen" in "any commission or other compensation due under this Agreement." The agreement between Tingey and Schmidt & Co. identifies Schmidt & Co. as a member of the class to be benefited. Under the circumstances we see no impediment to concluding that Schmidt & Co. was a third party beneficiary of the listing agreement between Berry and Schmidt & Co.

### DID SCHMIDT & CO. BREACH ITS FIDUCIARY DUTY TO BERRY?

■ Berry contends a factual issue exists as to whether Schmidt & Co. breached its fiduciary duty to Berry when Schmidt & Co., as broker, attempted to sell the property to Steve Schmidt, individually, who was also president of Schmidt & Co., without the consent of the seller.

Schmidt & Co., as appellant's broker, concedes it owes a duty of good faith to its principal and must disclose to its principal its relationship to a proposed buyer, but contends Steve Schmidt's relationship was fully disclosed.

"It is well settled that while an agent owes a duty of acting in the highest good faith towards his principal [citation] the agent nonetheless may acquire

---

[5]Civil Code section 1559 provides: "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."

property from his principal provided the agent makes full disclosure of all material facts concerning the transaction which might affect the principal's decision" and the principal consents to the relationship. (*Donnellan* v. *Rocks* (1972) 22 Cal.App.3d 925, 929 [99 Cal.Rptr. 692]; *Bate* v. *Marsteller* (1959) 175 Cal.App.2d 573, 580, 581 [346 P.2d 903].)

The written offers and counteroffer expressly reflect that Berry knew Steve Schmidt, individually, and Schmidt & Co. was acting in the dual capacity as broker and buyer. Berry chose to deal with him notwithstanding knowledge of such relationship.

It appears Berry is arguing that even though he had knowledge of Schmidt's dual capacity and in fact consented to sale to Schmidt if Schmidt purchased in accordance with the terms of the counteroffer, such consent was withdrawn when Schmidt rejected Berry's counteroffer. He argues that once the consent to sell to Schmidt was withdrawn there was no consent to Schmidt's dual capacity.

In our opinion, Berry's argument reflects a misunderstanding as to what is necessary for Schmidt & Co. to fulfill its fiduciary duty. Berry's withdrawal of consent to sell on certain terms is separate and distinct from his knowledge and consent to Schmidt's dual capacity. In fact, Berry's declaration reflects that he continued to be willing to deal with and sell to Schmidt if Schmidt would meet his terms. Once Berry knew of Schmidt's dual capacity and agreed to deal with him, he consented to the relationship and waived the disability, which cannot be conveniently reasserted merely because Schmidt & Co. would not meet his terms.

Further, we note there is no evidence or contention of actual bad faith or collusive dealings by Schmidt. Nor is there evidence that Schmidt sought to take advantage of Berry. Berry is a knowledgeable and sophisticated individual in real estate dealings. His holdings are extensive, and he has acted as principal in transactions including 200 to 300 parcels of real property owned by him.

### ATTORNEY'S FEES

Lastly, Berry asserts that Schmidt & Co. is not entitled to attorney's fees which were awarded by the trial court pursuant to section 10, subdivision (d), of the listing agreement, authorizing attorney's fees to the prevailing party. (See *ante,* pp. 1303-1304.)

Berry argues an award of attorney's fees is against the law since the only contract which contains a provision for attorney's fees is a contract between

Berry (and Shebelut) and Tingey, and that since Schmidt & Co. was not a party to that contract the court had no authority to award attorney's fees to it. On the other hand Schmidt & Co. contends it need not be a signatory to the contract to be entitled to attorney's fees.

Code of Civil Procedure section 1021 states that except as specifically provided by statute, attorney's fees are left to the agreement, either express or implied, of the parties. Due to the unequal bargaining power of the parties, however, often only one party to a contract is entitled to attorney's fees under a contract provision. To rectify this inequity, the Legislature enacted Civil Code section 1717 to create a reciprocal right to attorney's fees when the contract provides the right to one party and not the other.

Civil Code section 1717 states in relevant part: "(a) In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the prevailing party, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements.''

It is to be noted that the section authorizes attorney's fees "to the prevailing party . . . whether he or she is the party specified in the contract or not . . . .''

*Jones* v. *Drain* (1983) 149 Cal.App.3d 484 [196 Cal.Rptr. 827] is closest on point. In that case the appellant owners entered into an exclusive listing agreement with Sears Realty for sale of their home. Sears entered into an oral contract with the respondent, Bob Jones Realty, plaintiff below, in which the respondent agreed to act as a cooperating broker to find a purchaser for the Drain property. After the owners rejected an offer obtained by the respondent, the respondent filed suit against the owners, alleging various causes of action, including breach of contract. The trial court granted summary judgment on the breach of contract cause of action in favor of the owners but denied their request for attorney's fees on the ground that no contract existed between Jones and the owners. The court reversed the judgment in regard to attorney's fees and remanded for a hearing to determine the amount of attorney's fees and costs. The court identified the critical issue as follows: "[W]hether or not the plaintiff, Bob Jones Realty, clearly would have been entitled to attorney's fees had it prevailed in enforcing the contract against the defendants Drains [owners].'' (*Id.*, at p. 487.) (This is the precise issue involved herein.) The court then turned to the pleading to resolve this issue. Relying on *Babcock* v. *Omansky* (1973) 31 Cal.App.3d 625 [107 Cal.Rptr. 512] (*infra*) and *Reynolds Metals Co.* v. *Alperson* (1979)

25 Cal.3d 124 [158 Cal.Rptr. 1, 599 P.2d 83] (*infra*), the court reasoned that since the respondent's third cause of action against the appellants was for breach of a written contract containing an attorney's fee provision, had it prevailed in the cause of action it would have been entitled to attorney's fees. Consequently, the appellants satisfied all the elements of Civil Code section 1717 for recovery of attorney's fees.

In *Reynolds Metals Co.* v. *Alperson, supra,* 25 Cal.3d 124, the plaintiff brought an action against the shareholders and directors of three bankrupt corporations seeking to hold them liable for debts owed plaintiff by the corporation, claiming defendants were alter egos of the companies. One count of the complaint was based on two unpaid promissory notes executed by one of the corporations, with the other as an endorser, which provided for recovery of attorney's fees. Defendants had not signed the note. The trial court rejected the alter ego theory, absolving defendants of personal liability, and granted defendants attorney's fees. Plaintiff appealed. In ruling for defendants on their entitlement to attorney's fees, the California Supreme Court held that:

"Section 1717 was enacted to establish mutuality of remedy where contractual provision makes recovery of attorney's fees available to only one party . . . .

"Its purposes require section 1717 be interpreted to further provide a reciprocal remedy for a nonsignatory defendant, sued on a contract as if he were a party to it, when a plaintiff would clearly be entitled to attorney's fees should he prevail in enforcing the contractual obligation against the defendant.

"    .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Had plaintiff prevailed on its cause of action claiming defendants were in fact the alter egos of the corporation [citation], defendants would have been liable on the notes. Since they would have been liable for attorney's fees pursuant to the fees provision had plaintiff prevailed, they may recover attorney's fees pursuant to section 1717 now that they have prevailed." (*Id.,* at pp. 128-129.)

In *Babcock* v. *Omansky, supra,* 31 Cal.App.3d 625, a wife was sued for breach of four promissory notes executed by her husband on the theory she was liable as a joint venturer. An order of nonsuit was granted in the wife's favor. The wife, as prevailing party to the litigation, was granted attorney's fees pursuant to Civil Code section 1717 because the plaintiff in the underlying action was suing on the note providing for attorney's fees. (*Id.,* at

pp. 633-634.) The court held: "As the language of the statute expressly indicates, a party need not be a signatory to the contract in order to recover attorney's fees as the prevailing party—as such prevailing party he becomes entitled to fees 'whether he is the party specified in the contract *or not.*'" (*Id.*, at p. 633; see also *Saucedo* v. *Mercury Sav. & Loan Assn.* (1980) 111 Cal.App.3d 309 [168 Cal.Rptr. 552]; *Wilhite* v. *Callihan* (1982) 135 Cal.App.3d 295 [185 Cal.Rptr. 215].)

These precedents are determinative of the issue herein. Schmidt & Co. is entitled to attorney's fees as the prevailing party in the litigation though it was not a signatory to the original listing agreement.

Berry relies upon isolated excerpts from cases taken out of context. When read and analyzed in their entirety, those cases are either not inconsistent with the above decisions or are distinguishable on their facts. Notwithstanding Berry's argument to the contrary, the central holding in *Pas* v. *Hill* (1978) 87 Cal.App.3d 521 [151 Cal.Rptr. 98] was disapproved and overruled by the same court in *Saucedo* v. *Mercury Sav. & Loan Assn., supra,* 111 Cal.App.3d 309, 315.

The judgment is affirmed.

Hanson (P. D.), J., and Hamlin, J., concurred.

A petition for a rehearing was denied August 27, 1986, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 15, 1986.