MIKE PALM, INC. t/a
Timberlake's, Appellant,

v.

Carmela F. INTERDONATO, Appellee.

No. 87–357.

District of Columbia Court of Appeals.

Argued June 14, 1988.
Decided Sept. 30, 1988.

---

David F. Grimaldi, Washington, D.C., for appellant.

John C. Lenahan, Fairfax, Va., for appellee.

Before FERREN and STEADMAN, Associate Judges, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge:

This is an appeal from the denial of appellant's motion for judgment notwithstanding the verdict, which followed a trial where a jury awarded appellee $30,000 in damages as a consequence of appellant's refusal to pay appellee a commission for her services as a business broker. Appellant asserts that he is not liable for the commission because he did not sell his restaurant, contending that the clear language of the listing agreement entered into between the parties entitled appellee to receive a commission only if the sale of appellant's restaurant was actually consummated. Considering the language of the agreement in the context of the circumstances of this case, appellant's claim is without merit. We affirm.

Appellee, licensed in the District of Columbia as a business chance broker, operated a business brokerage firm known as The Business Exchange.[1] In the spring of

---

1. Essentially, a business broker facilitates the sale and purchase of business enterprises by locating and bringing together interested sellers and buyers to negotiate a contract of sale. Usually, the broker and the seller of the business enter into a listing agreement, which typi-

1984, appellee advertised several businesses that were for sale for which she and the respective owners had entered into listing agreements. Her efforts led to contact by prospective buyers Robert Bonitati and his partner Richard Hamilton, who were interested in purchasing a restaurant in the Capitol Hill area of the District of Columbia. Although this restaurant was sold to another buyer, Bonitati and Hamilton expressed to appellee their continuing desire to purchase a restaurant in the District of Columbia before the upcoming elections in November of 1984, apparently to profit from anticipated political functions in the area.

This endeavor led appellee to contact owners of various restaurants, including William Timberlake—the principal owner of appellant Mike Palm, Inc., which is the corporate owner of Timberlake's Restaurant on Pennsylvania Avenue, S.E.[2] After the broker explained that Bonitati and Hamilton were interested purchasers with readily available funds, Timberlake expressed his interest in selling the restaurant. Subsequently, on June 4, 1984, the broker entered into a listing agreement with Timberlake, as president of appellant Mike Palm, Inc. The trial court stated that "[t]he evidence at trial reflected that [the broker] and Timberlake discussed the terms of the sale in detail, and that [the broker] wrote those terms on the reverse side of the listing agreement pursuant to Timberlake's responses to [the broker's] questions. Timberlake read the agreement and signed it on both the front and back sides."[3] The pertinent provisions of the listing agreement provided that The Business Exchange would "undertak[e] to find a purchaser for" Timberlake's Restaurant, whereupon a commission of ten percent of the sales price would be paid to the broker if the restaurant was sold. The agreement also included the seller's basic terms of sale, including the seller's name, a description of the property, price, down payment, term of payment, and specific provisions for inventory and certain kitchen equipment.[4] No provision in the listing agreement precluded the sale of the restaurant before a specified date.

Once the listing agreement was signed, appellee contacted Bonitati and Hamilton, who subsequently met with Timberlake to discuss the financial details of the restaurant's operation. Timberlake rejected Bonitati and Hamilton's first offer of $285,000 to be paid in eight years because it did not meet his terms. A second purchase and sales agreement was drafted which conformed with all of the seller's terms contained in the listing agreement. See supra note 4. However, Timberlake then rejected this contract as well, contending that he was prevented, by a prior agreement, from selling the restaurant before January of 1985. This asserted time constraint was the sole basis for Timberlake's refusal to sell. Because Bonitati and Hamilton wanted to purchase a restaurant before the elections in November of 1984, the sale was never consummated. Timberlake refused to pay appellant the agreed upon commission.

Appellee commenced this action against appellant for breach of contract and fraud, seeking (a) recovery of her commission and

cally provides that the seller will pay the broker a specified commission upon locating an able buyer.

2. Timberlake also owns another restaurant of the same name on Connecticut Avenue in northwest, D.C. In addition, he had prior dealings with real estate brokers as a buyer. Thus, appellant's portrayal of himself as being "at the broker's mercy" during negotiation of the listing agreement is rather unconvincing.

3. *Interdonato, t/a "The Business Exchange" v. Mike Palm, Inc., t/a Timberlake's,* Civ. No. 9999–

84, Memorandum and Order, at 2 (D.C.Super.Ct. March 11, 1987), *reprinted in Record* at 60 (order denying appellant's motion for judgment notwithstanding the verdict).

4. Timberlake specified a selling price of $300,000, plus inventory, with a $100,000 down payment to be paid in cash (including a 10% down payment), with the entire balance to be paid within six years. In addition, the listing agreement noted that the restaurant's dishwashing machine was leased under a separate agreement.

(b) punitive damages for fraud.[5] After all the evidence was submitted, the trial court granted appellant's motion for a directed verdict on the count of fraud. The jury returned a verdict for appellee on the contract claim and awarded her $30,000 in damages, representing her lost commission. Subsequently, the trial court denied appellant's motion for judgment notwithstanding the verdict, and this appeal followed. Neither party contests the validity of the listing agreement, nor does anyone dispute that Bonitati and Hamilton were ready, willing and able purchasers who were secured by appellee to purchase appellant's restaurant. Further, Bonitati and Hamilton's offer to purchase the restaurant complied with all the terms set forth in the listing agreement. Thus, the sole issue presented is whether, under the terms of the listing agreement, the broker was entitled to her commission by securing ready, willing, and able purchasers.

## I.

A judgment notwithstanding the verdict should be granted "only in 'extreme' cases, in which no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party." *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100, 1103 (D.C.1986) (quoting *District of Columbia v. Cooper*, 445 A.2d 652, 655 (D.C.1982) (en banc)). A judgment notwith-

standing the verdict is "appropriate 'to remove from jury consideration those cases in which the facts ... permit but one reasonable conclusion as to the proper judgment.'" *Vassiliades v. Garfinckel's, Brooks Brothers*, 492 A.2d 580, 586 (D.C. 1985) (quoting *District of Columbia v. Cassidy*, 465 A.2d 395, 397 (D.C.1983)). However, "[w]here the evidence is such that reasonable persons could differ, the issue is properly put before the jury." *Lewis v. Washington Metropolitan Area Transit Authority*, 463 A.2d 666, 669 (D.C. 1983). In reviewing the denial of a motion for judgment notwithstanding the verdict, " 'this court must view the evidence and all reasonable inferences in the light most favorable to the party who obtained the jury verdict' and must reverse 'only if no juror could reasonably reach a verdict for the opponent of the motion.'" *District of Columbia v. Cassidy, supra,* 465 A.2d at 397–98 (quoting *Marcel Hair Goods Corp. v. National Savings & Trust Co.*, 410 A.2d 1, 5 (D.C.1979)).

In this case, the parties disagreed about the interpretation of the language contained in the listing agreement. The jury was presented with conflicting testimony regarding the alleged oral time restriction. When "disputed language in a contract is open to several reasonable interpretations," the issue presents a question of fact for the jury to resolve.[6] *Howard University v. Best*, 484 A.2d 958, 968 (D.C.1984).

> [T]he broker's right to a commission is not defeated by a failure of the parties to consummate the sale where such failure is attributable to the fault or misconduct of the seller. In the agreement with the broker, the seller may prescribe any conditions arbitrary or otherwise upon which the right to a commission shall depend.
> [I]f the terms of a written contract are ambiguous, then that ambiguity is to be resolved against the drafter of the contract. Any clear terms of the contract, of course, are to be given their clear meaning.

Before these instructions were given, the trial judge told the jury that:

> [A]n important part of your job in deciding this case will be your judgment about the testimony of the witnesses who have appeared before you. You should decide whether to believe what each person had to say and how important that testimony was. If there were

---

5. Appellee contended that Timberlake fraudulently induced her to secure prospective purchasers without any intent to sell the restaurant.

6. It is significant that appellant did not object to the instructions given to the jury. On the central issue of whether Timberlake breached the agreement to pay Interdonato a broker's commission, the trial court gave the following instructions to the jury:

> If an owner of a business grants a real estate broker the right to sell a designated business, the owner breaches the agreement if the broker finds a buyer ready, willing, and able to buy on the seller's terms and the seller refuses to sell the business to the buyer.
> [T]he right [of the seller] to reject the offer [by the buyer] does not defeat the broker's right to a commission if the offer that was produced meets the conditions in the listing agreement.

## II.

■■ As a general rule in this jurisdiction, a broker is entitled to receive a commission when the broker procures a buyer who is ready, willing and able to effect the purchase of the business on the terms stipulated by the seller, and this right to a commission is not defeated by failure of the seller and buyer to consummate the sale "where such failure is attributable to the fault or misconduct of the seller." *Gill v. American Security Corp.*, 209 A.2d 629, 631 (D.C.1965) (citing *Pastor v. Williams*, 135 A.2d 460, 461 (D.C.Mun.App.1957) and *Buckner v. Tweed*, 81 U.S.App.D.C. 256, 258, 157 F.2d 211, 213 (1946)); *see* 10 WILLISTON ON CONTRACTS § 1287, at 957 (3d ed. 1967); 3A CORBIN ON CONTRACTS § 768 (1963); 12 AM.JUR.2d *Brokers* §§ 182, 183, 200 (1980).

Notwithstanding this general rule, the seller is entitled to make the broker's employment and right to compensation contingent upon any lawful condition to which the parties consent. *Gill, supra,* 209 A.2d at 631 (citing *Dixon v. Bernstein*, 86 U.S. App.D.C. 336, 182 F.2d 104 (1950)); *see Steve Schmidt & Co. v. Berry*, 183 Cal. App.3d 1299, 1305–06, 228 Cal.Rptr. 689, 692 (1986). In this case, although the listing agreement contained Timberlake's terms of the sale, which were incorporated after a lengthy discussion with appellee, the agreement failed to include any term that allowed appellant to unilaterally rescind the brokerage agreement or restricted the date of sale until January 1985.

In *Gill, supra,* this court concluded that a clause in a listing agreement which reserved to the owner "the right to reject any offer until it is accepted in writing" did not serve to "defeat the broker's right to his commission if the offer produced meets the conditions in the listing agreement." 209 A.2d at 630–31. The seller's express right under contract law to reject the buyer's offer

> was insufficient to limit the broker's right to his earned commission once he had done all that was contemplated. If [the sellers] had wanted to make the

conflicts in the testimony, you have to decide

broker's commission dependent upon the ultimate execution of a contract of sale between themselves and the prospective purchaser produced by the broker, they could have easily done so by plain words to that effect in the listing agreement. Absent such express limitation, we are of the opinion that the broker who produces a buyer ready, willing and able to buy on the seller's terms earns his commission.

*Gill, supra,* 209 A.2d at 631. Therefore, explicit language in a listing agreement is required to limit the broker's right to a commission, which is usually earned upon procuring a purchaser who is ready, willing and able at the time of settlement to execute a sale on the seller's listing terms. The seller cannot avoid liability to pay the broker's commission by refusing to execute the sale where the broker has successfully completed her obligations under the listing agreement.

Appellant's reliance on *Dixon v. Bernstein*, 86 U.S.App.D.C. 336, 182 F.2d 104 (1950), is misplaced. In that case, the listing agreement entered into by a prospective buyer and broker expressly provided that the buyer would have "*no liability* [for the commission] *if sale is not settled.*" 86 U.S.App.D.C. at 336, 182 F.2d at 104. The buyer explicitly reserved the right to withdraw from the agreement "for any reason whatsoever." *Id.* at 336, 182 F.2d at 104. Thus, unlike this case, the broker's right to a commission in *Dixon* was expressly made contingent upon final consummation of the sale, regardless of the reason for default.

■■ Appellant asserts that use of the word "sold" in the listing agreement indicates the parties' intent that appellee would not earn her commission unless the sale of the restaurant was consummated. However, use of the word "sold" or "sell" unaccompanied by an explicit indication that Timberlake reserved the right to rescind the listing agreement "for any reason" was "insufficient to limit the broker's right to [her] earned commission once [she] had done all that was contemplated." *Gill, su-*

what the truth is.

*pra,* 209 A.2d at 631; *cf. Dixon v. Bernstein, supra.* The agreement at issue in this case provided that appellee "undert[ook] *to find* a purchaser for [Timberlake's]." (Emphasis supplied.) Under *Gill,* the jury could reasonably interpret this language as intending that appellee would earn a broker's commission upon securing a buyer ready, willing and able to execute a sale on the date of settlement pursuant to the seller's terms.

Thus, even though the listing agreement contains customary language authorizing the broker to "sell" property on behalf of the owner, the agreement accords to a broker only the right to list the property and locate a purchaser. The owner retains the right under contract law to reject any offer even though it meets the terms of the listing agreement. Consequently, when it comes to listing agreements, the word "sell," in reality, means something less than the full consummation of the transaction. In the context of a listing agreement, it follows that the provision entitling the broker to receive a commission if the property were "sold" means that the broker would receive a commission if she did what she was effectively authorized to do, *i.e.,* find a demonstrably ready, willing and able buyer to purchase the restaurant on the terms set forth in the listing agreement. Otherwise, unless there is explicit limiting language in the listing agreement, a seller would be accorded the right to defeat a commission notwithstanding the broker's full performance of her obligations under that agreement.

The verdict reflects the jurors' conclusion that appellee completely fulfilled her obligations under the listing agreement. It is significant that these were dealings between informed parties. Thus, it seems reasonable to infer that in "such a professionalized context," if the parties had intended to empower Timberlake with a uni-lateral right to rescind their agreement, "they would have done so." *Dixon v. Bernstein, supra,* 86 U.S.App.D.C. at 337, 182 F.2d at 105; *see Gill, supra,* 209 A.2d at 631. In the absence of such explicit language, we will not confer such an extraordinary right on the seller in relation to the brokerage agreement.[7]

### III.

■ Although the agreement did not contain any provision which limited appellee's right to a commission, Timberlake testified that he informed appellee of the time restriction during their initial discussions, and thus, appellee should have been bound by the condition. Appellee, on the other hand, testified that Timberlake never mentioned his alleged inability to sell the restaurant until January of 1985, despite her disclosure to Timberlake of Bonitati and Hamilton's eagerness and ability to effect an immediate purchase. In addition, Bonitati stated that although Timberlake indicated at their first meeting that the negotiations were proceeding too quickly, no specific date was mentioned nor was any reason to delay the sale discussed.

Resolution of this conflicting testimony and the witnesses' credibility was properly left to the jury. *Washington Welfare Association, Inc. v. Poindexter,* 479 A.2d 313, 315–17 (D.C.1984); *see Curry v. Giant Food Company of the District of Columbia,* 522 A.2d 1283, 1286 (D.C.1987) ("the outcome of the case depended largely upon how the jury resolved the credibility of the witnesses"); *Howard University v. Best, supra,* 484 A.2d at 968 (jury determines whether party knew of "usual practices" surrounding the contract); *Lee Washington, Inc. v. Washington Motor Truck Transportation Employees Health and Welfare Trust,* 310 A.2d 604, 606 (D.C. 1973) (existence of an oral condition prece-

7. The seller would reap a substantial windfall if he was accorded a unilateral right to rescind the agreement. After the broker expended substantial effort to secure a ready, willing, and able buyer willing to execute a purchase on the seller's terms, the seller could unreasonably refuse to consummate a deal, rescind the broker agreement, and then subsequently consummate a deal with the very same buyer, thereby avoiding liability to compensate the broker for her services. This court will not confer such an extraordinary right upon the seller unless he negotiates with the buyer to alter their usual rights and obligations, and this intent is manifested with explicit language to that effect.

dent is a question of fact). Evidently, the jury resolved the conflict in favor of appellee.

Viewing the evidence in a light most favorable to appellee, the trial court did not err in denying appellant's motion for judgment notwithstanding the verdict. Appellee, as a broker, secured a ready, willing and able buyer who agreed to purchase appellant's business pursuant to the seller's terms. Under the provisions of the listing agreement and the law of this jurisdiction, appellee's right to her commission vested at this time, when the buyer demonstrated he was ready, willing and able to effect the purchase at the date of settlement. The sale was defeated by Timberlake's refusal to consummate the deal at the terms set forth in the listing agreement. It was the province of the jury to resolve the factual disputes and any ambiguities of the agreement, and appellant has proffered no basis to disturb those findings.

Accordingly, the judgment on appeal is *AFFIRMED.*